Anthony Edward SPICER, Appellant

v.

COMMONWEALTH of Kentucky, Appellee.

No. 2013–SC–000735–MR.

Supreme Court of Kentucky.

Sept. 18, 2014.

Emily Holt Rhorer, Assistant Public Advocate, Counsel for Appellant.

Jack Conway, Attorney General of Kentucky, David Wayne Barr, Assistant Attorney General, Counsel for Appellee.

Opinion of the Court by Justice SCOTT.

A Whitley Circuit Court jury found Appellant, Anthony Edward Spicer, guilty of criminal attempt to commit murder and first-degree criminal assault. Appellant was sentenced to twenty years' imprisonment on the attempted murder charge and twelve years' imprisonment on the assault charge, to be served consecutively. He now appeals as a matter of right, Ky. Const. § 110(2)(b), asserting (1) his convictions for both attempted murder and assault violate our statutory restraints on double jeopardy, (2) a news reporter's interview with Appellant was improperly shown to the jury, and (3) the trial court's order imposing court costs and attorney's fees should be vacated. For the following reasons, we affirm in part and reverse in part.

## I. BACKGROUND

Appellant's girlfriend of five years, Ashley Warren, ended the relationship due to the couple's fighting and Appellant's drug use. Appellant moved out of Warren's home in October 2012, and began staying at Vincent Lawson's house. Appellant continued to see the couple's four year-old daughter on a regular basis, and would often stay with the child at Warren's home while she was at work. After work one day in February 2013, Warren agreed to give Appellant a ride to Lawson's. She attempted to find someone to ride with them, as she did not wish to be alone with Appellant, but she could not find anyone who was available.

According to Warren's testimony, on the ride to Lawson's, Appellant grew agitated with Warren, and tried unsuccessfully to get her phone from her. He wanted to know what she was doing, and accused her of being with someone else. When they arrived at Lawson's house, Appellant refused to get out of the car. He was crying, telling Warren he loved her, and saying that he did not want to be without her. Warren told Appellant that they were not good for one another. Warren testified that when Appellant realized she was not saying "I love you" back to him, he got angry.

Warren was afraid because during the ride to Lawson's she had seen Appellant fumbling with a knife he was holding down low between the passenger seat and the door. She asked him why he had the knife, but he did not respond. She asked him if he was going to kill her and if he was really going to take her away from her children. She did not exactly recall his response to this, but it was something about her "being dramatic."

Warren testified that, at that point, she knew something bad was going to happen. She jumped out of the car and began running toward Lawson's neighbor's house. Appellant followed and tackled her in the front yard. He got on top of her with his knee on her throat and started stabbing her with the knife. Warren screamed for help and attempted to fight back. She testified that "at one point" Appellant tried to drag her into the woods

so no one would hear her. Appellant stabbed Warren a total of sixteen times— on her chest, breast, back, side, hip, buttocks, and both sides of her neck. She also sustained defensive wounds on her hands and arms from trying to fight him off. During questioning at trial, the prosecution asked Warren if Appellant said anything to her while he was attacking her. She testified that "the last time he stabbed me was in my neck, and he told me that 'if I can't have you, then nobody will have you.' Those were the last words he said to me."

Lawson's neighbor, Betty Bundy, heard Warren's screams for help and ran outside to her front yard. There, she saw Appellant stabbing Warren. She got Appellant's attention and he stopped his attack. Bundy then went inside to get her cell phone. When she came back out, Appellant was still next to Warren, but left after Bundy grabbed at his sweatshirt. Bundy called 911 to report the incident. She was frenzied, trying to tend to Warren, when the police arrived.

Once police arrived, Warren was given medical attention and the police commenced their search for Appellant. Appellant called Lawson's cell phone, and Lawson brought the phone to the police. Appellant refused to turn himself in, saying he wanted to kill himself. Police used phone tracking and K–9 dogs to locate Appellant, who was ultimately found in Lawson's home, under his bed. He had to be taken to the hospital for dog bites and other injuries. On the way to the hospital, he kept repeating that he was sorry. He made similar apologies on camera to the news reporter that interviewed him after his arrest.

The jury was instructed on both criminal assault in the first degree and criminal attempt to commit murder. Appellant was convicted on both charges and sentenced as noted above. Appellant stipulated to the estimated restitution amount of $188,000 at sentencing. The court also imposed $130.00 in court costs, a public defender fee in the amount of $450.00, and a $20.00 arrest fee. This appeal followed.

## II. ANALYSIS

Appellant's chief argument on appeal is that his convictions for both criminal attempt to commit murder and first-degree assault violate our statutory restraints on double jeopardy. He also argues that admission of his video interview with the news reporter without a prior evidentiary hearing was improper. Finally, he argues that the trial court's order imposing court costs and attorney's fees should be vacated. We will address each argument in turn.

### A. Double Jeopardy

Double jeopardy determinations are subject to KRS 505.020. We recently discussed KRS 505.020 in *Kiper v. Commonwealth*, 399 S.W.3d 736, 741–42 (Ky.2012), noting:

Section 13 of the Kentucky Constitution ensures no person shall 'be twice put in jeopardy of his life or limb' for the same offense. In addition to prohibiting retrial for the same crime following a conviction or retrial following an acquittal, the 'final component of double jeopardy—protection against cumulative punishments—is designed to ensure that the sentencing discretion of courts is confined to the limits established by the legislature.' Therefore, a defendant may not be convicted of multiple crimes when there was but one course of conduct and a single *mens rea*. KRS 505.020 expresses our statutory structure for analyzing whether multiple con-

victions for the same course of conduct are permissible. . . .

(Internal citations omitted.)

In making this double jeopardy determination, we will examine KRS 505.020(1)(a), (b), and (c) in turn.

### 1. KRS 505.020(1)(a)

■ Under KRS 505.202(1)(a), "a single course of conduct may establish the commission of more than one (1) offense," but a defendant may not "be convicted of more than one (1) offense when: (a) One offense is included in the other, as defined in subsection (2). . . ."[1] In this respect we have previously held that first-degree assault is not a lesser offense included within attempted murder. *Kiper*, 399 S.W.3d at 742–43. This is because each charge requires an element that the other does not. *Id.* (explaining that assault requires that the victim have incurred a "serious physical injury" by use of a "deadly weapon," neither of which is an element of attempted murder, and attempted murder requires the intent to cause the death of the victim, which is not an element of assault). Because one offense is not included in the other, KRS 505.020(1)(a) is not applicable under these circumstances.[2]

### 2. KRS 505.020(1)(b)

1. KRS 505.020(2) states:

 A defendant may be convicted of an offense that is included in any offense with which he is formally charged. An offense is so included when:
 (a). It is established by proof of the same or less than all the facts required to establish the commission of the offense charged; or
 (b) It consists of an attempt to commit the offense charged or to commit an offense otherwise included therein; or
 (c) It differs from the offense charged only in the respect that a lesser kind of culpability suffices to establish its commission; or
 (d) It differs from the offense charged only in the respect that a less serious injury

■ However, KRS 505.020(*l*)(b) does bar prosecution for both attempted murder and first-degree assault, as "[i]nconsistent findings of fact are required to establish the commission of these offenses." In *Kiper*, the defendant was also convicted of both first-degree assault and attempted murder, after shooting the victim multiple times. *Id.* at 739. There, we held that "where the attack with a deadly weapon is the same act that constitutes the 'substantial step' required for the attempt charge—verdicts convicting a defendant for both crimes must necessarily be the result of inconsistent findings of fact by the jury." *Id.* at 744. We explained more specifically as follows:

> [T]o convict a defendant of attempted murder, the jury must find that [the defendant] specifically intended during the attack to kill the victim. *See* KRS 507.020, 506.010. On the other hand, and quite inconsistently, for the jury to convict the same defendant of first-degree assault for engaging in the same course of conduct, it must determine that his specific intent was not to kill, but merely to cause serious physical injury to the victim. *See* KRS 508.010. Therefore, as may easily be seen in the

or risk of injury or risk of injury to the same person, property or public interest suffices to establish its commission.

2. KRS 505.020(1)(a) and (2) together represent our codification of the *Blockburger* test, by which the constitutional standard of double jeopardy must be evaluated. *Kiper*, 399 S.W.3d at 742. In *Blockburger*, the United States Supreme Court held that "where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact the other does not." *Blockburger v. United States*, 284 U.S. 299, 304, 52 S.Ct. 180, 76 L.Ed. 306 (1932).

circumstances of this case, to convict Appellant for both attempted murder, and first-degree assault, the jury had to conclude that [the defendant] intended to kill [the victim] and, at the same instant, intended not to kill him but only to injure him. These inconsistent and mutually exclusive findings of fact regarding [the defendant's] *mens rea* at the moment he fired the shots at [the victim] lead precisely to the same result that KRS 505.020(*l*)(b) prohibits.

*Id.* at 744–45.

This Court's reasoning in *Kiper* applies directly to the facts at hand. In order for a jury to convict Appellant of both first-degree assault and attempted murder for stabbing Warren, it must determine that his specific intent was (1) to kill her, but and at the same time, (2) only to cause her serious physical injury. Such findings of fact are inconsistent, and are thus prohibited by KRS 505.020(*l*)(b).

### 3. KRS 505.020(1)(c)

KRS 505.020(*l*)(c) states that a defendant may not be convicted of more than one offense when "[t]he offense is designed to prohibit a continuing course of conduct and the defendant's course of conduct was uninterrupted by legal process, unless the law expressly provides that specific periods of such conduct constitute separate offenses." As the Commonwealth points out, KRS 505.020(*l*)(c) does *not* bar the prosecution or conviction upon multiple offenses arising out of a single course of conduct when the facts establish that two or more *separate and distinct* attacks occurred during the episode of criminal behavior. *Id.* (citing *Welborn v. Commonwealth*, 157 S.W.3d 608, 611–12 (Ky.2005)). However, as we explained in *Kiper*, "for multiple convictions to be proper there must have been a cognizable lapse in [the defendant's] course of conduct during which the defendant could

have reflected upon his conduct, if only momentarily, and formed the intent to commit additional acts." *Id.* (citing *Welborn*, 157 S.W.3d at 612 and *Terry v. Commonwealth*, 253 S.W.3d 466, 474 (Ky. 2008)).

In *Kiper*, the Commonwealth argued that the defendant's convictions for both attempted murder and first-degree assault were proper because some of the gunshots were fired with the intention of causing the victim's death, while others were fired with the intention of causing only serious physical injury. *Id.* at 745. However, we held that because of the rapid rate of gunfire the defendant directed at the victim, the evidence in *Kiper* did not support "a reasonable conclusion that some of the shots were fired with the intent to wound while others were fired with the intent to kill." *Id.* at 746. In other words, the defendant did not have "ample time to pause and reflect, and reformulate his intention between each shot." *Id.* at 745–46.

We distinguished the facts of *Kiper* from those of *Welborn*, in which the defendant was convicted of three counts of first-degree assault after shooting a trooper three separate times, with each shot preceded by a sufficient period of time in which the defendant could reflect on his conduct and formulate an intent to commit another act:

Evidently, the recoil of the weapon prevented Welborn from immediately shooting again, and the trooper moved to a doorway and sought cover in the next room. As the trooper left the house, Welborn fired again and the officer was struck in the neck. The trooper then made it to his cruiser, removed a shotgun, and pointed it at Welborn who moved to a corner of the house. Welborn fired again and hit the officer for a third time in the shoulder. Evidence was introduced that the three shots re-

sulted in three separate serious physical injuries.

*Welborn* 157 S.W.3d at 612.

Furthermore, because we determined the evidence did not support a reasonable conclusion that some of the shots were fired with the intent to wound, while others were fired with the intent to kill, we distinguished the facts in *Kiper* from those in *Quisenberry v. Commonwealth,* 336 S.W.3d 19 (Ky.2011). *Kiper,* 399 S.W.3d at 746. In *Quisenberry,* we held that the defendant's conduct constituted two separate offenses when he shot a child once in the thigh and once in the head. *Id.* at 38–39. We noted that although the proof did not allow for a conclusion about the time lapse between the two gunshots, the victim's thigh and head injuries were "markedly distinct," and regarded them as constituting separate offenses—the shot to the thigh an assault with the intent to injure and the shot to the head an attempt to kill. *Id.* at 41–42.

*Turning to the present case,* the Commonwealth asserts that the facts here are closer to those in *Welborn* and *Quisenberry,* than to *Kiper.* It attempts to divide Appellant's conduct into two separate offenses by distinguishing between the first fifteen stab wounds and the sixteenth and final stab wound, which was to Warren's neck. The Commonwealth points out that Appellant did not make any statement expressing his state of mind during the first fifteen stabbings, but that he paused before inflicting the sixteenth stab wound and said, "If I can't have you, then nobody will have you." Thus, it argues that the first fifteen stabbings constitute the first-degree assault and the final stab wound is the attempted murder.

We are not convinced that Appellant's conduct represents two separate courses of action. *Warren's* testimony established that Appellant concealed a knife on the passenger side of the vehicle. She suspected that he intended to kill her, and asked him if he was really going to take her away from her children. She fled from the car in fear, and he followed her with the knife. They struggled, and he proceeded to repeatedly stab her in vital places. As a result of the first fifteen stab wounds, Warren lost part of one lung and four renal veins, amongst other serious injuries, including a separate stab wound to the neck.

Furthermore, Warren's testimony makes it unclear as to whether Warren did, in fact, briefly pause before the sixteenth stab. She testified that his last stab was to her neck "and he told me, 'if I can't have you, then nobody will.'" She did not specifically state in her testimony that he paused before the last stab in order to say this. Her testimony does not indicate a clear break in time constituting "a sufficient period of time in which the defendant could reflect on his conduct and formulate an intent to commit another act." *Welborn,* 157 S.W.3d at 612. We believe the facts here are more similar to those of *Kiper* than those of *Welborn.* The stab wounds to Warren's body came through a single struggle that is clearly different from the geographical and temporal separation of attacks in *Welborn.*

The present facts are also distinguishable from those in *Quisenberry.* Appellant's first fifteen stab wounds included a stab to Warren's neck and other vital places that could have been equally as fatal as the final stab wound. It is unreasonable to claim that Appellant did not intent to kill Warren with any of the first fifteen stabs, either individually or collectively, but did intend to kill her with a second stab to her neck. We have consistently held that "a series of acts *that are readily distinguishable* is not a [single] course of conduct for double jeopardy purposes."

*Hill v. Commonwealth*, 2008–SC–000100MR, 2009 WL 2706960 (Ky. Aug. 27, 2009). However, we do not find in this case that the first fifteen times Appellant stabbed Warren are readily distinguishable from the sixteenth time Appellant stabbed Warren.

■ Thus, Appellant's convictions of both first-degree assault and attempted murder violate our bar against double jeopardy. The remedy for these types of double jeopardy violations is to vacate the conviction for the lesser offense. *Kiper* at 746 (citing *Lloyd v. Commonwealth*, 324 S.W.3d 384, 391 n. 26 (Ky.2010); *Brown v. Commonwealth* 297 S.W.3d 557, 562–63 (Ky.2009); *Clark v. Commonwealth*, 267 S.W.3d 668 (Ky.2008)). In this case, as in *Kiper*, we deem attempted murder to be the more serious of the two crimes "because acting with the intent to kill another person is generally considered to be more malevolent, and thus more reprehensible conduct than acting with the intent to inflict injury." *Kiper*, 399 S.W.3d at n. 17. Thus, we affirm Appellant's conviction and sentence for attempted murder and reverse and vacate Appellant's conviction and sentence for the "lesser" offense of first-degree assault.

### B. Appellant's Video Confession

■ Appellant's second argument on appeal is that a video interview a news reporter conducted with Appellant subsequent to his arrest was improperly shown to the jury without a prior evidentiary hearing. The video was played in full at trial. In the video, Appellant is seated in a jail cell, and a jail official is present during the entire interview. The interview was apparently conducted shortly after Appellant's arrest. The reporter asks Appellant to walk him through what happened, and Appellant describes how he found out his "wife" was cheating on him and he "kind of snapped." At times he is only moderately coherent, but he responds to questions from the reporter, describing that he and Warren had an "altercation," and he apologizes to Warren and his family for what happened. Appellant states that he loves Warren with all his heart and that "love makes people do crazy things."

At trial, the judge overruled Appellant's motion to prohibit the introduction of the video after "having heard arguments of counsel." However, Appellant asserts that no evidentiary hearing was actually held, and that RCr 9.78 clearly commands the trial court to hold an evidentiary hearing once counsel demands the suppression of evidence.

RCr 9.78 states:

> If at any time before trial a defendant moves to suppress, or during trial makes timely objection to the admission of evidence consisting of (a) a confession or other incriminating statements alleged to have been made by the defendant *to police authorities*, (b) the fruits of a search, or (c) witness identification, the trial court shall conduct an evidentiary hearing outside the presence of the jury and at the conclusion thereof shall enter into the record findings resolving the essential issues of fact raised by the motion or objection and necessary to support the ruling. If supported by substantial evidence the factual findings of the trial court shall be conclusive.

(Emphasis added.)

Although Appellant clearly made incriminating statements in the video interview, he made the statements to a news reporter, not to "police authorities" as required under RCr 9.78. Thus, RCr 9.78 is inapplicable and we find no error here.

## C. Imposition of Attorney's Fees and Court Costs

Appellant's third and final argument on appeal is against the trial court's order imposing on Appellant a public defender fee of $450.00, court costs of $130.00, and an arrest fee of $20.00. Appellant was represented at trial by an attorney with the Department of Public Advocacy. It appears that this attorney was already appointed to Appellant's case by the time he was arraigned in circuit court. At no point does the record reflect an assessment of Appellant's financial status, other than that he was represented by a public defender throughout the trial proceedings, and he was permitted to proceed on appeal *in forma pauperis.* Appellant argues that the order imposing these fees should be vacated because he was clearly indigent.

Turning first to the imposition of attorney's fees, KRS 31.211 states in pertinent part:

At arraignment, the court shall conduct a nonadversarial hearing to determine whether a person who has requested a public defender is able to pay a partial fee for legal representation, the other necessary services and facilities of representation, and court costs. The court shall order payment in an amount determined by the court and may order that payment be made in a lump sum or by installment payments to recover money for representation provided under this chapter. This partial fee determination shall be made at each stage of the proceedings.

The Commonwealth argues that KRS 31.211 makes clear that, if a court determines that a defendant "is able to pay a partial fee for legal representation," then a partial fee may be assessed for the public defender. KRS 31.211 does not place any limits on the period of time that can be considered for ability to repay, and the Commonwealth postures that Appellant will get paid for the work he does in prison, and can pay the fee from those sums.

■ KRS 31.120, on the other hand, establishes the procedures by which the trial court is to determine whether a person is "needy" under the statute for purposes of eligibility for the appointment of a public defender. It states in pertinent part:

(1) (a) The determination of whether a person covered by KRS 31.110 is a needy person shall be deferred no later than his or her first appearance in court or in a suit for payment or reimbursement under KRS 31.211, whichever occurs earlier.

(b) The court of competent jurisdiction in which the case is pending shall then determine, with respect to each step in the proceedings, whether he or she is a needy person. However, nothing shall prevent appointment of counsel at the earliest necessary proceeding at which the person is entitled to counsel, upon declaration by the person that he or she is needy under the terms of this chapter. In that event, the person involved shall be required to make reimbursement of the representation if he or she later is determined not a needy person under the terms of this chapter.

(c) A person who, after conviction, is sentenced while being represented by a public defender *shall continue to be presumed a needy person, and the court, at the time of sentencing, shall enter an Order In Forma Pauperis for purposes of appeal without having to show further proof of continued indigency,* unless the court finds good cause after a hearing to determine that the defendant should not continue to be considered an indigent person.

(Emphasis added.) Appellant in this case was represented by a public defender at the time of sentencing, and was granted *in*

*forma pauperis* status on appeal. Thus, it is clear his indigency continued throughout trial. There is simply no record of any hearing in which the trial court later found good cause to determine the defendant should not continue to be considered an indigent person. Thus, without such findings, the court's imposition of a $450.00 attorney fee was improper, and we now vacate it.

 Second, we turn to the issue of court costs and the arrest fee. We note there has recently been some confusion in this area of law, and we now clarify as follows. "[T]his Court has inherent jurisdiction to cure ... sentencing errors." *Jones v. Commonwealth,* 382 S.W.3d 22, 27 (citing *Travis v. Commonwealth,* 327 S.W.3d 456, 459 (Ky.2010)). A "sentencing issue" constitutes "a claim that a sentencing decision is ·contrary to statute ... or was made without fully considering what sentencing options were allowed by statute...." *Jones v. Commonwealth,* 382 S.W.3d at 27 (Ky.2011) (citing *Grigsby v. Commonwealth,* 302 S.W.3d 52, 54 (Ky. 2010)). The phrase "sentencing is jurisdictional" is simply a "manifestation of the non-controversial precept that an appellate court is not bound to affirm an illegal sentence just because the issue of the illegality was not presented to the trial court." *Jones v. Commonwealth,* 382 S.W.3d at 27.

 The assessment of court costs in a judgment fixing sentencing is illegal *only* if it orders a person adjudged to be "poor" to pay costs. Thus, while an appellate court may reverse court costs on appeal to rectify an illegal sentence, we will not go so far as to remand a facially-valid sentence to determine if there was in fact error. If a trial judge was not asked at sentencing to determine the defendant's poverty status and did not otherwise presume the defendant to be an indigent or poor person before imposing court costs,

then there is no error to correct on appeal. This is because there is no affront to justice when we affirm the assessment of court costs upon a defendant whose status was not determined. It is only when the defendant's poverty status has·been established, and court costs assessed contrary to that status, that we have a genuine "sentencing error" to correct on appeal.

 In this case, the record does not reflect an assessment of Appellant's financial status, other than that he was appointed a public defender and permitted to proceed on appeal *in forma pauperis.* A defendant who qualifies as "needy" under KRS 31.110 because he cannot afford the services of an attorney is not necessarily "poor" under KRS 23A.205. *Maynes v. Commonwealth,* 361 S.W.3d 922, 929 (Ky. 2012). Thus, simply because Appellant was represented by a public defender does not mean he is necessarily exempt from court costs. Because the trial judge's decision regarding court costs was not inconsistent with any facts in the record, the decision·does not constitute error, "sentencing" or otherwise, and we affirm the imposition of court costs and the arrest fee.

### III. CONCLUSION

For the aforementioned reasons, we reverse Appellant's conviction for first-degree assault and vacate the corresponding sentence; affirm his conviction and sentence for attempted murder, along with the imposition of court costs and the arrest fee; and vacate the imposition of the partial attorney's fee. We therefore remand this matter to the Whitley Circuit Court for entry of a new judgment consistent with this opinion.

All sitting. All concur.