RENDERED: OCTOBER 29, 2021; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2020-CA-0697-MR

DIANA MARKLE APPELLANT

v.
APPEAL FROM FULTON CIRCUIT COURT
HONORABLE TIMOTHY A. LANGFORD, JUDGE
ACTION NO. 19-CR-00086

COMMONWEALTH OF KENTUCKY APPELLEE

OPINION
AFFIRMING IN PART,
VACATING IN PART, AND REMANDING

** ** ** ** **

BEFORE: CETRULO, LAMBERT, AND TAYLOR, JUDGES.

LAMBERT, JUDGE: Diana Markle has directly appealed from the final judgment

of the Fulton Circuit Court convicting her of first-degree wanton endangerment,

first-degree possession of a controlled substance (methamphetamine), and several

misdemeanors, for which she received a five-year prison sentence. She was also

ordered to pay various fees and costs. The Commonwealth has conceded that the

trial court impermissibly ordered Markle to pay the public defender fee; therefore, that part of the judgment is vacated. Otherwise, we find no error or abuse of discretion and affirm the remainder of the judgment.

The underlying criminal action arose from an incident on July 9, 2019, when Chief Deputy Ryan Amberg of the Fulton Sheriff's Office and Officer Austin Matheny of the Fulton Police Department stopped a van driven by Markle. Chief Deputy Amberg had recognized her front seat passenger, Greg Watts, and knew he had an active warrant from Graves County. The officers stopped the van after Markle veered over the yellow line. Her two great-grandchildren were in the back seat in car seats. Markle originally gave the officers a false name, but when Chief Deputy Amberg saw a pill bottle in Markle's purse with a different name on it, she admitted to giving them a false name. She also consented to a search of her purse, which was on the console between the front driver and passenger seats. Chief Deputy Amberg gave the purse to Officer Matheny to search. In the purse, Officer Matheny found a billfold that contained her identification card as well as a small bag containing a substance later determined to be methamphetamine. Also found were a hard eyeglasses case that contained a meth pipe, a piece of hanger, and two straws as well as a bottle that contained methamphetamine. Markle denied knowing how the items had gotten into her purse. While this was going on, the younger child was crying, and the older child had unbuckled the car seat and

was walking around. Markle's purse had been at least one foot away from the children.

Chief Deputy Amberg described the circumstances of the stop in more detail in the uniform citation:

> On above date and time I observed a red van driving in front of me cross over the center line and jerk back over into the right lane. At this time I performed a traffic stop on the vehicle in question. When I spoke to the driver [she] identified herself as BICKY MCCORMICK. The driver stated she did not have a drivers license but kept grabbing her purse when I asked about the license. I identified the passenger in the vehicle as Greg Watts who I had previously dealt with a month prior and knew he had an active arrest warrant out of Graves [C]ounty. After running the information the driver gave me I was unable to find anyone matching the information given. The driver was asked several times what her name was and she insisted her name was Bicky. Inside the vehicle there were two small kids. One being 2 years old and the other 3 months old. After placing the passenger in custody the driver got out of the vehicle and went to the passenger side of the car and was messing with the kids. At this time she was digging in her purse saying she was getting her kids a sucker[.] I noticed a pill bottle in the purse that had a different name and asked the female who's [sic] pills and she stated they were hers. The name on the pill bottle was Diana Markle and the prescription was for oxycodone. At this time I asked the female if there was anything else in the purse and she stated no and gave consent to search the purse. Inside the purse was a TN ID that matched her with the name of Diana Markle. The female stated that it was her and she had a suspended license that's why she gave a fake name. Also next to the id was a clear bag with white powder. After further search of the purse a pink glasses container with a glass pipe and another bottle with suspected meth was found in

the container. She was arrested for the substances and took [sic] to FCDC. Child services was called and was to open up an investigation on the matter.

As a result, Markle was charged by the Fulton County Grand Jury with a six-count indictment, comprised of two felony charges and four misdemeanor charges. She was charged with giving officer false name or address pursuant to Kentucky Revised Statutes (KRS) 523.110(1), operating a motor vehicle on a suspended or revoked license pursuant to KRS 186.620(2),[1] first-degree possession of a controlled substance (methamphetamine) pursuant to KRS 218A.1415, possession of drug paraphernalia pursuant to KRS 218A.500(2), first-degree wanton endangerment pursuant to KRS 508.060, and failure of non-owner operator to maintain required insurance, first offense, pursuant to KRS 304.39-060. At the arraignment, the court appointed a public defender and ordered Markle to pay a public defender fee of $200.00 at a rate of $25.00 per month based upon her receipt of social security disability benefits, and Markle entered a plea of not guilty.

A jury trial was held on December 3, 2019. The Commonwealth presented testimony from Chief Deputy Amberg and Officer Matheny, who testified about the details of the traffic stop. Eric Vanover from the Kentucky State

---

[1] This charge was later amended to operating a motor vehicle without a license pursuant to KRS 186.410.

Police lab testified about the testing of the suspected drugs seized during the stop, confirming that the substances tested were methamphetamine. At the close of the Commonwealth's case, Markle moved for a directed verdict on all charges. Specifically as to the first-degree wanton endangerment charge, Markle argued the Commonwealth had not proven the wantonness element. The Commonwealth responded that there were narcotics in the van at least a foot from the children and that it had presented sufficient proof on the rest of the charges as well. The court denied the motion, stating that the motion related to the wanton endangerment charge was a close call. The court noted that while both children were in car seats, the officer testified that the drugs were at least a foot away from them. Both the children and the purse were moveable, and the older child was at an age to get into things.

Markle opted to testify in her case-in-chief. She did not know how the items got into her purse and denied that she used drugs. Watts had given her back the eyeglasses case, although she did not blame him for placing anything in it. She also did not call him to testify. Markle renewed her motion for a directed verdict at the close of her case. She argued that there was no testimony about a dangerous situation having been created. The Commonwealth pointed to the testimony that the older child tried to get out of her seat and had been running around the van while the purse was still in the car and therefore could have gotten

into the drugs. The court determined that this represented a factual question for the jury to decide and denied the renewed motion.

In closing argument, defense counsel stated that Watts had put the drugs in Markle's purse, which placed her in the situation with her great-grandchildren that gave rise to the wanton endangerment charge. He said Watts had plenty of time to access Markle's purse where it sat between his seat and the driver's seat, such as when Markle was out of the van paying for gas. In its closing argument, the Commonwealth questioned why Markle had not called Watts or her former sister-in-law, Lisa, to testify, suggesting that their testimony would not have supported Markle's testimony. Markle then moved for a mistrial based upon the Commonwealth's closing argument, stating that the Commonwealth had shifted the burden to her to produce witnesses to defend her testimony. The Commonwealth countered that Markle had brought Watts into the case and accused him of placing the drugs in her purse. Therefore, the Commonwealth continued, caselaw permitted the Commonwealth to comment on the unavailability of the defense's witnesses. The court denied the motion.

Following deliberation, the jury returned a verdict of guilty to all six charges. The jury then recommended penalties of a three-year sentence for the wanton endangerment conviction; a two-year sentence for the possession of a controlled substance conviction; 30 days in the county detention center for the

convictions of giving the officer a false name, operating a motor vehicle without a license, and the failure to maintain insurance; and one month in the county detention center for the possession of drug paraphernalia conviction. The jury recommended that her sentences should run consecutively for a total of five years.

At the sentencing hearing, the court confirmed that Markle received social security disability benefits of just less than $800.00 per month and found that she was not able-bodied. If given time when she was out of jail, Markle agreed that she would be able to pay her court costs. The trial court entered a final judgment memorializing the jury's verdict on December 20, 2019. In addition to the prison sentence, the court ordered Markle to pay court costs of $185.00 by November 15, 2020, and a fee of $20.00 per day for the 19 days she spent in the custody of the Fulton County Detention Center. By separate order, the court stated it had heard testimony regarding Markle's financial status at the time of sentencing. Based on its findings, the court required Markle to pay the court costs and fines it assessed. By another separate order, the court addressed the jail fee of $20.00 per day. The court stated that Fulton County had "adopted a jail fee ordinance pursuant to applicable statute and has established a jail fee of $20.00 per day for inmates housed in the Fulton County Detention Center[.]" The court ordered Markle to pay $380.00 for the 19 days she spent in the detention center. The court granted Markle's motion to proceed *in forma pauperis* on appeal and

appointed the Department of Public Advocacy to represent her. This appeal now follows.

On appeal, Markle asserts that the trial court erred when it denied her motion for a directed verdict on the wanton endangerment charge, when it allowed a witness to testify as to drug paraphernalia, and when it levied fees and costs against her. She also asserts that the Commonwealth impermissibly shifted the burden of proof in cross-examining Markle and in its closing argument. We shall address each of these arguments in turn.[2]

We shall first consider whether the trial court should have granted Markle's motion for a directed verdict on the first-degree wanton endangerment charge.

> On motion for directed verdict, the trial court must draw all fair and reasonable inferences from the evidence in favor of the Commonwealth. If the evidence is sufficient to induce a reasonable juror to believe beyond a reasonable doubt that the defendant is guilty, a directed verdict should not be given. For the purpose of ruling on the motion, the trial court must assume that the evidence for the Commonwealth is true, but reserving to the jury questions as to the credibility and weight to be given to such testimony.

---

[2] Markle has withdrawn the second argument in her brief related to the jury instructions for the wanton endangerment charge. Therefore, we shall not address that argument.

> On appellate review, the test of a directed verdict is, if under the evidence as a whole, it would be clearly unreasonable for a jury to find guilt, only then the defendant is entitled to a directed verdict of acquittal.

*Perdue v. Commonwealth*, 411 S.W.3d 786, 790 (Ky. App. 2013) (citing *Commonwealth v. Benham*, 816 S.W.2d 186, 187 (Ky. 1991)). "To defeat a directed verdict motion, the Commonwealth must only produce 'more than a mere scintilla of evidence.'" *Lackey v. Commonwealth*, 468 S.W.3d 348, 352 (Ky. 2015) (quoting *Benham*, 816 S.W.2d at 187).

KRS 508.060(1) codifies the felony of first-degree wanton endangerment: "A person is guilty of wanton endangerment in the first degree when, under circumstances manifesting extreme indifference to the value of human life, he wantonly engages in conduct which creates a substantial danger of death or serious physical injury to another person." The Commonwealth based this charge on the location of Markle's purse containing methamphetamine in close proximity in the van to the children. Markle contends that the Commonwealth failed to establish the wantonness element of this crime because her conduct did not reach the necessary level of wantonness to prove that offense. And because the Commonwealth has the burden of proof pursuant to KRS 500.070(1) ("The Commonwealth has the burden of proving every element of the case beyond a reasonable doubt,") Markle argues that the trial court should have granted a directed verdict on that charge.

-9-

Markle argues that the evidence presented by the Commonwealth was that the children were in their car seats while her purse containing the methamphetamine was in the van. Therefore, the children were unable to access anything in the purse. The older child was only out of her car seat after the officers had removed the purse from the van. Merely having the illegal drugs in the proximity of the children, Markle asserts, was not enough to establish there was a risk of death or serious physical injury or extreme indifference to the value of human life. In support of this argument, Markle cites to the Supreme Court of Kentucky's opinion in *Swan v. Commonwealth*, 384 S.W.3d 77 (Ky. 2012).

In *Swan*, the Court addressed the differences between first- and second-degree wanton endangerment:

> The differences between first- and second-degree wanton endangerment are the mental state and degree of danger created. As to the mental state, both crimes require wanton behavior, but first-degree also requires "circumstances manifesting extreme indifference to the value of human life," which has been described as "aggravated wantoness." *E.g.*, *Ramsey v. Commonwealth*, 157 S.W.3d 194, 197 (Ky. 2005). As to the danger created, first-degree requires a substantial danger of death or serious physical injury, whereas second-degree requires only a substantial danger of physical injury. The distinction between the two degrees of the crime was described in the commentary in part as follows:
>
>> Creation of the two offenses is necessitated by the wide differences in dangerousness that exist with the various types of wanton

> conduct. For example, aimlessly firing a
> gun in public is not as wanton in degree as
> firing a gun into an occupied automobile and
> should not carry the same criminal sanction.
>
> KRS 508.060 Kentucky Crime Commission/LRC
> Commentary (1974). In the examples given, aimlessly
> firing a gun in public would be the second-degree crime
> and firing a gun into an occupied car would be the first-
> degree crime. Or, as described by Professors Lawson
> and Fortune, "Firing a weapon in the immediate vicinity
> of others is the prototype of first degree wanton
> endangerment. This would include the firing of weapons
> into occupied vehicles or buildings." Robert G. Lawson
> & William H. Fortune, *Kentucky Criminal Law* § 9-
> 4(b)(2), at 388 n. 142 (1998) (citations omitted).

*Swan*, 384 S.W.3d at 102. The Court held that the firing of guns near the victims in a living room supported first-degree wanton endangerment convictions, while the firing of guns not in the immediate vicinity of a person in a back bedroom did not. *Id.* at 102-04. Markle contends that, because the older child was unrestrained only after the purse was out of the van, the situation was more akin to firing a gun outside of the vicinity of the victim in the bedroom. We disagree.

Based upon our review of the case, we agree with the Commonwealth that the trial court properly denied Markle's motion for a directed verdict on this charge. The testimony established that Markle's open purse was on the center console of the van at least one foot away from the children, who were seated behind the driver and front passenger seats. Chief Deputy Amberg testified that the older child had unbuckled her car seat and was walking around the van. There

-11-

was sufficient evidence for the jury to find that Markle's conduct established that she had consciously disregarded a substantial and unjustifiable risk that the children – at least the older child – could have accessed the methamphetamine in her open purse a foot away. And if either child had ingested the methamphetamine, it could have resulted in the child's death or serious physical injury. Accordingly, it would not have been clearly unreasonable for a jury to find guilt, and Markle was not entitled to a directed verdict of acquittal on the first-degree wanton endangerment charge.

Next, Markle argues that Chief Deputy Amberg's testimony regarding the use of straws and a piece of hanger with the use of methamphetamine was not admissible as he had not been qualified as an expert witness. This issue is unpreserved, and Markle seeks palpable error review pursuant to Kentucky Rules of Criminal Procedure (RCr) 10.26. The Supreme Court of Kentucky defined palpable error review in *Schoenbachler v. Commonwealth*, 95 S.W.3d 830, 836 (Ky. 2003) (footnotes omitted), as follows:

> A palpable error is one of that "affects the substantial rights of a party" and will result in "manifest injustice" if not considered by the court, and "[w]hat it really boils down to is that if upon a consideration of the whole case this court does not believe there is a substantial possibility that the result would have been any different, the irregularity will be held nonprejudicial."

*See also Miller v. Commonwealth*, 283 S.W.3d 690, 695 (Ky. 2009) ("an unpreserved error that is both palpable and prejudicial, still does not justify relief unless the reviewing court further determines that it has resulted in a manifest injustice; in other words, unless the error so seriously affected the fairness, integrity, or public reputation of the proceeding as to be 'shocking or jurisprudentially intolerable.'").

Markle argues that Chief Deputy Amberg should have been qualified as an expert witness pursuant to Kentucky Rules of Evidence (KRE) 702 before being permitted to testify as to the use of hanger pieces to push residue into a meth pipe and of straws to snort methamphetamine. KRE 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if:
>
> (1) The testimony is based upon sufficient facts or data;
>
> (2) The testimony is the product of reliable principles and methods; and
>
> (3) The witness has applied the principles and methods reliably to the facts of the case.

Because Chief Deputy Amberg did not testify as to any training he had in the use of drug paraphernalia, Markle asserts that this testimony should have been excluded.

The Commonwealth, on the other hand, argues that Chief Deputy Amberg did not have to be qualified as an expert to offer this testimony. KRE 701 provides:

> If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are:
>
> (a) Rationally based on the perception of the witness;
>
> (b) Helpful to a clear understanding of the witness' testimony or the determination of a fact in issue; and
>
> (c) Not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

We agree that Chief Deputy Amberg could testify as a lay witness to a reasonable inference of what these items were used for. In addition, the Commonwealth points out that the only item listed in the instruction for the possession of drug paraphernalia charge was the glass pipe found in the eyeglasses case. Accordingly, the introduction of how the piece of hanger and straws could be used has no bearing on whether Markle was guilty of possession of drug paraphernalia, and we find no manifest injustice on this issue.

For her next argument, Markle asserts that the Commonwealth shifted the burden of proof during her cross-examination and in the closing argument related to Markle's failure to call Watts or her former sister-in-law, Lisa, to support her defense that the drugs and drug paraphernalia in her purse were not hers but

were placed there by someone else, namely, Watts or Lisa. During her testimony, Markle recounted that she had recently retrieved several items that Lisa had stolen from her, including the eyeglasses case in which the officers found methamphetamine and drug paraphernalia.

The first instance took place during Markle's cross-examination when the Commonwealth asked her whether she had called Watts to testify, since she was essentially blaming him for the methamphetamine. Markle responded that she was not blaming him but rather was stating that Watts gave the eyeglasses case back to her. She asserts that this line of questioning suggested to the jury that she had the duty and burden to prove her innocence. This instance was not preserved for review, and Markle seeks palpable error review.

The Commonwealth cites to *Matthews v. Commonwealth*, 371 S.W.3d 743, 751 (Ky. App. 2011), to argue that such questioning was proper:

> It was certainly proper for the Commonwealth to attack the credibility of Matthews' alibi testimony by pointing out that he did not call as witnesses any of the people he named, including his mother and brother, nor did he produce any other documentary evidence to support his version of events.

While the *Matthews* Court was considering such statements in the context of a closing argument, we agree with the Commonwealth that such questioning as to Markle's alibi testimony could have been clarified or further explained on re-direct examination. We find no palpable error justifying reversal.

The second instance occurred during the Commonwealth's closing argument, when the Commonwealth Attorney told the jury that Markle failed to call either Watts or Lisa to testify because she was afraid of what they would say. Markle moved for a mistrial based on this argument, which the trial court denied.

> The decision to grant a mistrial is within the sound discretion of the trial court and such a ruling will not be disturbed absent an abuse of discretion. "A mistrial is an extreme remedy and should be resorted to only when there appears in the record a manifest necessity for such an action or an urgent or real necessity."

*Shemwell v. Commonwealth*, 294 S.W.3d 430, 437 (Ky. 2009) (citing *Bray v. Commonwealth*, 177 S.W.3d 741, 752 (Ky. 2005)), *overruled on other grounds by Padgett v. Commonwealth*, 312 S.W.3d 336 (Ky. 2010).

In *Childers v. Commonwealth*, 332 S.W.3d 64, 73 (Ky. 2010), *abrogated on other grounds by Allen v. Commonwealth*, 395 S.W.3d 451 (Ky. 2013), the Supreme Court of Kentucky addressed closing arguments, detailing what the Commonwealth Attorney is permitted to do:

> While the prosecutor has a duty to confine his or her argument to the facts in evidence, *Caretenders, Inc. v. Commonwealth*, 821 S.W.2d 83, 89 (Ky. 1991), the prosecutor is entitled to draw reasonable inferences from the evidence, make reasonable comment upon the evidence and make a reasonable argument in response to matters brought up by the defendant, *Hunt v. Commonwealth*, 466 S.W.2d 957, 959 (Ky. 1971). *See also Wheeler v. Commonwealth*, 121 S.W.3d 173, 180 (Ky. 2003). Further, a prosecutor is given wide latitude in making arguments to the jury, *Williams v.*

> *Commonwealth*, 644 S.W.2d 335, 338 (Ky. 1982), and may "appeal to the jury with all of the power, force, and persuasiveness which his learning, skill, and experience enable him to command," *Housman v. Commonwealth*, 128 Ky. 818, 110 S.W. 236 (1908).

*See also Matthews*, *supra*.

Here, we find no abuse of discretion in the trial court's denial of Markle's motion for a mistrial. In the closing argument, defense counsel specifically blamed Watts for placing the drugs in Markle's purse and pointed out that he had sufficient time to access her purse in the van when she was not in it. The Commonwealth had every right to counter this argument by using Markle's failure to call Watts or Lisa as witnesses to infer that they would not support her testimony that the drugs were not hers and that she did not know how the drugs and paraphernalia got into her purse. Accordingly, we find no palpable or reversible error on this issue.

Finally, Markle argues that the trial court erred in imposing a $200.00 public defender fee, $185.00 in court costs, and $380.00 in jail fees. None of these issues was preserved, but we shall nevertheless review them for abuse of discretion. *See Elliott v. Commonwealth*, 553 S.W.3d 207, 210 (Ky. 2018) (internal quotation marks and citations omitted) ("Kentucky statutory law affords trial courts immense discretion in setting criminal penalties. Such decisions are ultimately committed to the trial court's sound discretion, and we review these

rulings for an abuse of discretion. So we will not disturb the trial court's

sentencing determination unless convinced that its decision was arbitrary,

unreasonable, unfair, or unsupported by sound legal principles.").

In *Spicer v. Commonwealth*, 442 S.W.3d 26 (Ky. 2014), the Supreme

Court of Kentucky extensively addressed the issue of costs and fees in criminal

actions. As to the imposition of a public defender fee, the Court stated:

> Appellant's third and final argument on appeal is
> against the trial court's order imposing on Appellant a
> public defender fee of $450.00, court costs of $130.00,
> and an arrest fee of $20.00. Appellant was represented at
> trial by an attorney with the Department of Public
> Advocacy. It appears that this attorney was already
> appointed to Appellant's case by the time he was
> arraigned in circuit court. At no point does the record
> reflect an assessment of Appellant's financial status,
> other than that he was represented by a public defender
> throughout the trial proceedings, and he was permitted to
> proceed on appeal *in forma pauperis*. Appellant argues
> that the order imposing these fees should be vacated
> because he was clearly indigent.

> Turning first to the imposition of attorney's fees,
> KRS 31.211 states in pertinent part:

> > At arraignment, the court shall conduct a
> > nonadversarial hearing to determine whether
> > a person who has requested a public
> > defender is able to pay a partial fee for legal
> > representation, the other necessary services
> > and facilities of representation, and court
> > costs. The court shall order payment in an
> > amount determined by the court and may
> > order that payment be made in a lump sum
> > or by installment payments to recover

money for representation provided under this chapter.  This partial fee determination shall be made at each stage of the proceedings.

The Commonwealth argues that KRS 31.211 makes clear that, if a court determines that a defendant "is able to pay a partial fee for legal representation," then a partial fee may be assessed for the public defender.  KRS 31.211 does not place any limits on the period of time that can be considered for ability to repay, and the Commonwealth postures that Appellant will get paid for the work he does in prison, and can pay the fee from those sums.

KRS 31.120, on the other hand, establishes the procedures by which the trial court is to determine whether a person is "needy" under the statute for purposes of eligibility for the appointment of a public defender.  It states in pertinent part:

> (1) (a) The determination of whether a person covered by KRS 31.110 is a needy person shall be deferred no later than his or her first appearance in court or in a suit for payment or reimbursement under KRS 31.211, whichever occurs earlier.
>
> (b) The court of competent jurisdiction in which the case is pending shall then determine, with respect to each step in the proceedings, whether he or she is a needy person.  However, nothing shall prevent appointment of counsel at the earliest necessary proceeding at which the person is entitled to counsel, upon declaration by the person that he or she is needy under the terms of this chapter.  In that event, the person involved shall be required to make reimbursement of the representation if he or

-19-

she later is determined not a needy person under the terms of this chapter.

(c) A person who, after conviction, is sentenced while being represented by a public defender *shall continue to be presumed a needy person, and the court, at the time of sentencing, shall enter an Order In Forma Pauperis for purposes of appeal without having to show further proof of continued indigency*, unless the court finds good cause after a hearing to determine that the defendant should not continue to be considered an indigent person.

(Emphasis added.) Appellant in this case was represented by a public defender at the time of sentencing, and was granted *in forma pauperis* status on appeal. Thus, it is clear his indigency continued throughout trial. There is simply no record of any hearing in which the trial court later found good cause to determine the defendant should not continue to be considered an indigent person. Thus, without such findings, the court's imposition of a $450.00 attorney fee was improper, and we now vacate it.

*Spicer*, 442 S.W.3d at 34-35.

As to the issues of court costs, the *Spicer* Court instructed:

Second, we turn to the issue of court costs and the arrest fee. We note there has recently been some confusion in this area of law, and we now clarify as follows. "[T]his Court has inherent jurisdiction to cure . . . errors." *Jones v. Commonwealth*, 382 S.W.3d 22, 27 (citing *Travis v. Commonwealth*, 327 S.W.3d 456, 459 (Ky. 2010)). A "sentencing issue" constitutes "a claim that a sentencing decision is contrary to statute . . . or was made without fully considering what sentencing options were allowed by statute. . . ." *Jones v.*

-20-

*Commonwealth*, 382 S.W.3d at 27 (Ky. 2011) (citing *Grigsby v. Commonwealth*, 302 S.W.3d 52, 54 (Ky. 2010)). The phrase "sentencing is jurisdictional" is simply a "manifestation of the non-controversial precept that an appellate court is not bound to affirm an illegal sentence just because the issue of the illegality was not presented to the trial court." *Jones v. Commonwealth*, 382 S.W.3d at 27.

The assessment of court costs in a judgment fixing sentencing is illegal only if it orders a person adjudged to be "poor" to pay costs. Thus, while an appellate court may reverse court costs on appeal to rectify an illegal sentence, we will not go so far as to remand a facially-valid sentence to determine if there was in fact error. If a trial judge was not asked at sentencing to determine the defendant's poverty status and did not otherwise presume the defendant to be an indigent or poor person before imposing court costs, then there is no error to correct on appeal. This is because there is no affront to justice when we affirm the assessment of court costs upon a defendant whose status was not determined. It is only when the defendant's poverty status has been established, and court costs assessed contrary to that status, that we have a genuine "sentencing error" to correct on appeal.

In this case, the record does not reflect an assessment of Appellant's financial status, other than that he was appointed a public defender and permitted to proceed on appeal *in forma pauperis*. A defendant who qualifies as "needy" under KRS 31.110 because he cannot afford the services of an attorney is not necessarily "poor" under KRS 23A.205. *Maynes v. Commonwealth*, 361 S.W.3d 922, 929 (Ky. 2012). Thus, simply because Appellant was represented by a public defender does not mean he is necessarily exempt from court costs. Because the trial judge's decision regarding court costs was not inconsistent with any facts in the record, the decision does not constitute error,

-21-

> "sentencing" or otherwise, and we affirm the imposition
> of court costs and the arrest fee.

*Spicer*, 442 S.W.3d at 35.

In the present case, the trial court found that Markle was a needy person pursuant to KRS Chapter 31, appointed a public advocate to represent her, and found that her financial status permitted the payment of a partial public defender fee. The Commonwealth has conceded on the public defender fee issue based upon the holding in *Spicer*, *supra*. While we question whether the facts in the present case were as similar as the Commonwealth stated in its brief, we shall accept the concession and vacate the imposition of the public defender fee without further discussion.

The trial court, in the final judgment, also ordered Markle to pay $185.00 in court costs. In her brief, Markle combined her arguments relating to the imposition of a public defender fee and the imposition of court costs, arguing that she was a needy person pursuant to KRS 31.110(2)(a) for purposes of the public defender fee and a poor person pursuant to KRS 453.190(2) for purposes of the court costs.

KRS 23A.205 provides for the mandatory payment of costs by a convicted defendant in a criminal matter, with one exception:

> (2) The taxation of court costs against a defendant, upon conviction in a case, shall be mandatory and shall not be subject to probation, suspension, proration, deduction, or

other form of nonimposition in the terms of a plea bargain or otherwise, unless the court finds that the defendant is a poor person as defined by KRS 453.190(2) and that he or she is unable to pay court costs and will be unable to pay the court costs in the foreseeable future.

KRS 23A.205(3) permits the court to set up an installment payment plan if a convicted defendant does not meet the standard of a poor person but cannot pay the full amount at the time of sentencing. KRS 453.190(2) defines a "poor person" as:

> [A] person who has an income at or below one hundred percent (100%) on the sliding scale of indigency established by the Supreme Court of Kentucky by rule or is unable to pay the costs and fees of the proceeding in which he is involved without depriving himself or his dependents of the necessities of life, including food, shelter, or clothing.

In *Elliott*, *supra*, the Supreme Court of Kentucky addressed the statutory differences between a needy person and a poor person:

> In *Maynes v. Commonwealth*, this Court distinguished between an indigent/needy defendant and a poor defendant. 361 S.W.3d 922, 928-29 (Ky. 2012). An indigent, or needy, defendant is one who is unable "to provide for the payment of an attorney and all other necessary expenses of representation." *Id*. at 929. "A poor person means a person who is unable to pay the costs and fees of the proceeding in which he is involved without depriving himself or his dependents of the necessities of life, including food, shelter, or clothing." *Id*. (citing KRS 453.190(2)) (internal quotations omitted).

> Indigency and public defender appointment determinations require a present tense analysis, while poor person status and the imposition of court costs require consideration of the defendant's present ability to

-23-

pay and his or her ability to pay in the foreseeable future. *Maynes*, 361 S.W.3d at 929. It is therefore well settled that an indigent defendant receiving the services of appointed counsel is not automatically entitled to a waiver of court costs.

553 S.W.3d at 211. Because Markle's disability benefits amount of $757.00 per month, or $9,084.00 per year, was well under the amount listed in the federal guidelines for a household of one person ($12,490.00 per year), Markle asserts that she was a poor person and should not have to pay court costs.

The Commonwealth argues that Markle is not permitted to bring the argument that she is a poor person because she did not request such a determination from the trial court. Our review of the sentencing hearing reflects that the trial court confirmed that Markle was receiving social security disability benefits and was not able-bodied. However, Markle agreed that she would be able to pay the court costs if given time when she was released from jail. The trial court opted to defer payment of court costs until November 15, 2020. We find no abuse of discretion in the court's decision to impose court costs in this instance.

Finally, Markle argues that the trial court improperly ordered her to pay $380.00 for the jail fee, representing $20.00 per day for the 19 days she spent in the Fulton County Detention Center. KRS 441.265(1) states that "[a] prisoner in a county jail shall be required by the sentencing court to reimburse the county for

expenses incurred by reason of the prisoner's confinement as set out in this section, except for good cause shown." KRS 411.265(2)(a)2. goes on to provide that

> [t]he jailer may adopt, with the approval of the county's governing body, a prisoner fee and expense reimbursement policy, which may include, but not be limited to, the following: . . . A per diem for room and board of not more than fifty dollars ($50) per day or the actual per diem cost, whichever is less, for the entire period of time the prisoner is confined to the jail[.]

Markle argues that the trial court did not include any documentation supporting the detention center's adoption of a jail fee policy and that she had established good cause to be excused from payment of the fee.

The Commonwealth cites to this Court's unpublished opinion of *McAllister v. Commonwealth*, No. 2019-CA-000243-MR, 2020 WL 4917921 (Ky. App. Aug. 21, 2020), a case arising from the same circuit court in Fulton County:

> The order of the circuit court assessing jail fees specifically points out that the fee of $22 a day was adopted by Fulton County "pursuant to applicable statute." The cases above involved this issue from this same circuit wherein there was no indication in the record that the per diem rate was established in accordance with the statute. Now that the order assessing establishes that the per diem fee was established as the law requires, and as there was no objection to the manner in which the county so established the per diem, the assessment shall stand.

*Id.* at *3. The present order also includes the recitation that Fulton County had adopted the jail fee ordinance "pursuant to applicable statute[.]" Therefore, we find no error in the assessment of a jail fee under Markle's first argument.

Likewise, we reject Markle's additional argument that she had shown good cause for being exempted from the payment of the fee based upon the failure of the jailer to take into account that she lived on a subsistence-level income. At the sentencing hearing, the trial court took into consideration Markle's ability to pay before imposing costs and fees. Therefore, we find no abuse of discretion. We decline to find that "[t]he equities and bounds of fair play demand" that this Court reverse the orders imposing costs and fees.

For the foregoing reasons, the final judgment and orders of the Fulton Circuit Court are affirmed, with the exception of the order requiring Markle to pay the public defender fee. That order is vacated, and this matter is remanded for the entry of a judgment consistent with this Opinion.

ALL CONCUR.

BRIEFS FOR APPELLANT:        BRIEF FOR APPELLEE:

Julia K. Pearson               Daniel Cameron
Frankfort, Kentucky          Attorney General of Kentucky

                                       Stephanie L. McKeehan
                                       Assistant Attorney General
                                       Frankfort, Kentucky