Edward John JACOBSEN, Appellant

v.

COMMONWEALTH of Kentucky, Appellee.

No. 2011–SC–000108–MR.

Supreme Court of Kentucky.

Aug. 23, 2012.

As Corrected Sept. 11, 2012.

Steven Jared Buck, Assistant Public Advocate, Department of Public Advocacy, Frankfort, KY, Counsel for Appellant.

Jack Conway, Attorney General of Kentucky, James Daryl Havey, Office of the Attorney General, Frankfort, KY, Counsel for Appellee.

Opinion of the court by Justice ABRAMSON.

Edward Jacobsen appeals as a matter of right from a Judgment of the Fayette Circuit Court convicting him, following a jury trial, of robbery in the first degree in violation of Kentucky Revised Statute (KRS) 515.020. The trial court sentenced Jacobsen, in accord with a second jury's findings and recommendations, to a term of twenty years in prison enhanced to thirty years by virtue of Jacobsen's status as a second-degree persistent felony offender (PFO). Jacobsen was accused and found guilty of having robbed at gun point the manager of a Cash Advance store on Versailles Road in Lexington. On appeal, Jacobsen contends that the trial court erred (1) by denying his motion to suppress eyewitness identification evidence; (2) by not allowing him during *voir dire* to inform the jury of the potential range of PFO enhanced penalties; (3) by denying his motion for a mistrial when, during *voir dire*, the Commonwealth suggested that Jacobsen had concealed evidence of the crime— the gun; (4) by denying his motion for a mistrial when, during its guilt-phase closing argument, the Commonwealth referred to scientific studies of which there was no evidence; and (5) by denying his motion for a new trial, not just a new penalty

phase, when during the original penalty proceedings, the Commonwealth's improper "golden rule" argument necessitated a mistrial. Convinced that Jacobsen was fairly tried and properly sentenced, we affirm the trial court's Judgment.

### RELEVANT FACTS

The manager of the Versailles Road Cash Advance store, Dena Fallon, testified that on September 5, 2008, at about 10:00 a.m., she was at work in the store by herself when an older man entered, came to the customer counter, and demanded the money from the cash drawer. He placed his hand on the counter, and Ms. Fallon realized that he was holding a gun, which he pointed at her abdomen. She gave him the money—a bit more than $500.00—and he then ordered her to lie face down on the floor and to count to twenty-five. Ms. Fallon counted to forty-five, she testified, to give the man plenty of time to leave, at which point she got up, locked the door, and called the police. To the responding officer she described the robber as a white male between sixty and seventy years old, not much taller than she is—she is about 5′4″—and about 160 to 170 pounds. He was wearing, she said, blue jeans and a long-sleeved red-and-blue flannel shirt over a grey T-shirt. He wore glasses with darkened lenses and a red baseball type cap. Ms. Fallon also described the gun as a black, small caliber semi-automatic.

The responding officer testified that Ms. Fallon was visibly shaken, but that after she had calmed down some, he left her and interviewed Lori Harris, the property manager for the strip mall where the Cash Advance store is located, and whose office was only a couple of doors away from Cash Advance. Harris told him that earlier that morning, between 9:30 and 10:00, she had seen an older man wearing a long-sleeved blue-and-maroon flannel shirt exit a white, dual-cab Chevrolet S–10 pickup truck and walk in the direction of the Cash Advance store. Her attention was drawn to the man because he parked in what seemed an odd part of the lot, well away from the only stores open at that time, and because his long-sleeved shirt seemed an odd choice for a very warm late summer morning. She was walking in the opposite direction, and they crossed paths next to each other. The man wore glasses and had on a grey T-shirt under his flannel shirt. A short time later she saw the same man walking along Versailles Road back toward his truck. A few minutes after that, after she had gone back to her office, she saw the man for a third time, this time as he passed just outside her window, again in the direction of the Cash Advance. He had put on a ball cap—Harris remembered it as blue—and had wrapped an elastic bandage around his left hand, which Harris thought peculiar. Almost immediately she saw the man for yet a fourth time, as he again passed her window, this time hurrying back toward his truck.

As property manager, Harris monitored the shopping center and its parking lots by means of some dozen surveillance cameras positioned on and around the property. She was thus able to provide the police with security videos showing a man in jeans and a flannel shirt entering the Cash Advance store, exiting it about thirty seconds later, and walking hurriedly to a white pickup truck. From those videos the police produced still images of the man and the truck and had those images broadcast on the local news. A day or so later, Jacobsen's former employer, Keith Taminga, called the Crime Stoppers' tip line and reported that the Cash Advance robber looked to him like Jacobsen, a former employee who Taminga believed had recently been involved in a theft from Taminga's business. Although the surveillance pho-

tos did not clearly depict the robber's features, Taminga recognized Jacobsen's truck and reported that Jacobsen habitually wore long-sleeved flannel shirts. Based on this tip, the detective to whom the case had been assigned, Detective Andrew Cain, promptly prepared a six-person photo array that included a photo of Jacobsen and presented the array separately to Dena Fallon and to Lori Harris. Both women unhesitatingly picked out Jacobsen's photo as that of the Cash Advance robber.

Officers apprehended Jacobsen in February 2009. At the time of his arrest Jacobsen, who is five-feet-seven-inches tall, was sixty-two years old, weighed 140 pounds, and was driving a white Chevrolet S–10 pickup truck that belonged to him. He was indicted in March 2009 and was charged with first-degree robbery and with receiving stolen property, the latter charge stemming from the alleged theft of property from Keith Taminga. Prior to trial, the charges were severed, and the robbery charge was tried in March 2010. At trial Taminga testified regarding Jacobsen's use of a white Chevy truck and his habit of wearing long-sleeved flannel shirts. Fallon and Harris testified as noted above, and both identified Jacobsen in court as the man they had encountered during the morning of September 2, 2008.

Jacobsen presented an alibi defense. Three witnesses, friends of his, testified that on the day of the robbery he had been with them in Wellington, Kentucky, some sixty or seventy miles east of Lexington. Jacobsen also presented the testimony of Solomon Fulero, a PhD psychologist who specializes in the study of human memory. Dr. Fulero testified concerning factors bearing on the fallibility of eyewitness testimony. As noted, the jury rejected Jacobsen's defense and found him guilty of the Cash Advance robbery.

## ANALYSIS

### I. Jacobsen Was Not Entitled to Suppression of the Eyewitness Identifications.

Jacobsen's first contention on appeal is that because the photo array the detective presented to Fallon and Harris highlighted Jacobsen's photo and thus unduly suggested that it was the photo of the suspect, the women's identifications of him, both prior to trial and in court, were tainted and should have been suppressed. The trial court denied Jacobsen's suppression motion.

▮▮▮ As Jacobsen correctly notes, the United States Supreme Court has held that a defendant's right to due process includes a

> check on the admission of eyewitness identification [evidence], applicable when the police have arranged suggestive circumstances leading the witness to identify a particular person as the perpetrator of a crime. An identification infected by improper police influence ... is not automatically excluded. Instead, the trial judge must screen the evidence for reliability pretrial. If there is "a very substantial likelihood of irreparable misidentification," *Simmons v. United States,* 390 U.S. 377, 384, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968), the judge must disallow presentation of the evidence at trial. But if the indicia of reliability are strong enough to outweigh the corrupting effect of the police-arranged suggestive circumstances, the identification evidence ordinarily will be admitted, and the jury will ultimately determine its worth.

*Perry v. New Hampshire,* —— U.S. ——, 132 S.Ct. 716, 720, 181 L.Ed.2d 694 (2012). Confronted with a motion to suppress eyewitness identification evidence, therefore,

the trial court has a two-fold task. First, it must determine whether the photo array (or other identification procedure employed by police) was unduly suggestive, and if so (but only if so) it must then determine whether the identification was nevertheless sufficiently reliable in view of the totality of the circumstances. *Id.; Manson v. Brathwaite,* 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977); *Simmons v. United States,* 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968). As with other suppression rulings, we review the trial court's findings of historical fact, if any, for clear error, but its ultimate application of the constitutional standards is a question of law which we review *de novo. Stanton v. Commonwealth,* 349 S.W.3d 914 (Ky.2011) (noting that ultimate question of confession's voluntariness reviewed *de novo* ); *United States v. Wiseman,* 172 F.3d 1196 (10th Cir.1999) ("[T]he ultimate question of whether trial and pretrial identification evidence infringed due process rights is reviewed *de novo.*").

■ "The key to the first step," we have observed, "is determining whether Appellant stood out of the lineup so much that the procedure was 'unduly suggestive.' " *Oakes v. Commonwealth,* 320 S.W.3d 50, 57 (Ky.2010). In making that determination, courts have considered such factors as the size of the array, the officer's manner of presenting it, and the details of the pictures themselves. *United States v. Rosa,* 11 F.3d 315 (2nd Cir.1993); *Wiseman,* 172 F.3d 1196. Six-photo arrays, such as the one used here, have been deemed large enough to pass constitutional muster. *See, e.g., United States v. Carter,* 410 F.3d 942 (7th Cir.2005); *Bernal v. People,* 44 P.3d 184 (Colo.2002). Detective Cain, the only witness at the suppression hearing, testified that he met with Fallon and Harris separately, that he presented virtually identical copies of the array to both of them, and that he did nothing to

suggest to either woman that Jacobsen's photo was that of the suspect. Jacobsen does not contend otherwise. He contends rather, that the array itself was unduly suggestive because the background in his photo is darker than the backgrounds in the others and because he is the only person pictured wearing dark clothing. Those differences are especially telling in this array, he contends, because while a six-photo array may not be unduly suggestive *per se,* differences between photos in a small array will stand out more sharply than they would in a larger array, and so a small array, such as the one here, deserves more exacting scrutiny. *Wiseman,* 172 F.3d 1196 (citing *United States v. Sanchez,* 24 F.3d 1259 (10th Cir.1994)). Although we do not disagree that the size of the array is an important factor to consider, we agree with the trial court that this particular six-photo array was not unduly suggestive.

■ Detective Cain testified that he used computer software to locate photographs of individuals close to Jacobsen in age, height, and weight, and that from those photographs he selected ones resembling Jacobsen in other ways. All the photos in the array are head or head-and-shoulder shots in black and white of similarly complected, non-bespectacled men in roughly the same age group with similar builds. All but two have medium length, dark hair, with that of the other two somewhat shorter, and all have similarly trimmed mustaches. Jacobsen and one other man are pictured wearing jackets; another is in a heavy, possibly flannel shirt; and three are wearing T-shirts. The backgrounds of the photos are all plain, blank surfaces and range from bright in two of them, through medium, to the somewhat darker background in Jacobsen's photo. While it is true, as Jacobsen notes, that he is the only person pictured wearing both a

dark shirt and a dark jacket and that the background of his photo is somewhat darker than those of the others, these incidental differences do not cause Jacobsen's picture to stand out in a suggestive way. It is inevitable, after all, that separate photos of different individuals will all be unique in one way or another. What matters is not that a suspect's photo is different from the others, but that the differences are such as to suggest police suspicion or culpability, such as stark irregularities suggesting that the other pictures were selected together as controls, whereas the odd picture is apt to be the suspect, *Wiseman*, 172 F.3d 1196 or differences that mark the suspect's photo as singularly like the witness's description of the perpetrator. *Oakes*, 320 S.W.3d 50 (citing *Foster v. California*, 394 U.S. 440, 89 S.Ct. 1127, 22 L.Ed.2d 402 (1969)). Jacobsen has not explained how the unique aspects of his photo are in any way suggestive of suspicion or culpability. His dark shirt and jacket are not like the attire the witnesses attributed to the robber; indeed, another man pictured in the array has a plaid, possibly flannel shirt as described by Fallon and Harris. Several courts have noted, moreover, that normal variations in background tones and hues do not make a photo array unduly suggestive. *See, e.g., United States v. Harris*, 636 F.3d 1023 (8th Cir.2011); *United States v. Mathis*, 264 F.3d 321 (3rd Cir. 2001); *United States v. Burdeau*, 168 F.3d 352 (9th Cir.1999). Since neither the manner in which Jacobsen is dressed in his photo nor the photo's background stand out as unusual, mark Jacobsen as a suspect, or make his photo seem to have been selected on a basis different than that applied to the others, the trial court correctly ruled that the array was not unduly sug-

gestive. That being the case, the due process inquiry is over, and there is no need to consider the reliability of Fallon's and Harris's identifications, determinations the trial court properly left to the jury.

## II. The Trial Court Correctly Limited Penalty–Range *Voir Dire* to Unenhanced Penalties For the Indicted Offense.

█ Jacobsen next contends that his trial was rendered unfair when he was not allowed during *voir dire* to question the venire concerning the full range of potential sentences. Jacobsen, as noted, was charged with first-degree robbery, a Class–B felony punishable by a sentence of imprisonment from ten to twenty years. The Commonwealth also alleged that Jacobsen was a second-degree persistent felon, a status which, if found by the jury, would enhance the penalty and make the Class–B felony punishable by imprisonment from twenty years to life. Jacobsen wished to inform the prospective jurors that the potential penalties ranged from ten years to life, but the trial court, in accord with this Court's ruling in *Lawson v. Commonwealth*, 53 S.W.3d 534 (Ky. 2001), allowed him to inform them only of the ten-to-twenty year penalty range for first-degree robbery. Jacobsen acknowledges that the trial court's ruling was correct under *Lawson*, but he urges us to reconsider *Lawson*, because, he maintains, the *Lawson* approach both denies potential jurors information they need in order to make "honest decisions about whether they [are] fit to serve," and denies counsel information they need in order to make intelligent decisions regarding peremptory challenges and challenges for cause.[1]

---

1. Jacobsen also asserts that the *Lawson* approach somehow undermines the purpose of KRS 532.055, the truth-in-sentencing statute. We disagree. A primary purpose of KRS

532.055 is to ensure that information about the defendant relevant only to sentencing, such as his prior criminal history, be excluded for the most part from the guilt phase of

■ In *Lawson,* this Court reaffirmed its view that in all criminal cases, not just capital ones, "the right to a fair and impartial jury requires the jury to possess the ability to consider the full range of penalties." 53 S.W.3d at 541. We recognized, however, that in non-capital cases confusion had arisen regarding how to pose penalty-range questions during *voir dire,* and that the confusion stemmed largely from uncertainty about how the possible penalty range should be described. Should the possibilities include potential PFO sentences? Sentences for potential lesser included offenses? Sentences run consecutively as opposed to concurrently? Trying to account for all of these possibilities, we concluded, unduly complicated the trial court's task, risked misleading the jury about its role and about what was truly at stake in the case, and risked disclosing, implicitly, the defendant's prior criminal record. Weighing these risks against the need to give the potential jurors some sentencing information if their ability to consider the full range of penalties was to be meaningfully assessed, we struck the balance by limiting *voir dire* examination to the "jurors' ability to consider only the penalty ranges for the individual indicted offenses without PFO enhancement." *Lawson,* 53 S.W.3d at 544. While not perfect, perhaps, this approach, we continue to believe, adequately apprises prospective jurors of their role, gives counsel a meaningful basis for challenges, "allow[s] substantial confidence in jurors' abilities to consider the full range of penalties," *id.,* and does so "without potentially misleading [the jurors] or otherwise prejudicing the defendant." *Id.*

■ Jacobsen argues that since his case did not involve the possibility of lesser included offenses or consecutive sentencing there was no uncertainty about how to describe the potentially PFO enhanced penalty range and little chance of confusing or misleading the jury. In these circumstances, he insists, the *Lawson* approach needlessly prevented him from identifying venire-persons who "would insist on only giving a life sentence once presented with that option." We are persuaded, however, that the sort of sentencing bias with which Jacobsen purports to be concerned is unusual, especially so among prospective jurors who have indicated a willingness to consider the minimum penalty for the indicted offense, and so does not warrant the confusion and uncertainty that would inevitably attend a case-by-case approach to what should be a simple and straightforward part of the *voir dire* examination. We decline, therefore, to overrule *Lawson,* which the trial court correctly applied.[2]

---

trial and introduced only after guilt has been determined. Far from undermining this purpose, *Lawson* advances it. Otherwise, KRS 532.055 is addressed to sentencing, not to *voir dire.*

2. In addition to the arguments referred to in the text, Jacobsen asserts, without argument or citation to any supporting authority, that the limited *voir dire* in this case violated his constitutional right to due process. Although we do not believe that the constitutional question has been adequately raised, we note that the United States Supreme Court has held that the due process guarantee includes a right to "an adequate *voir dire* to identify unqualified jurors," *Morgan v. Illinois,* 504 U.S. 719, 729, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992). That Court has also made it clear, however, that the scope of *voir dire* is generally a matter of trial court discretion and that "[t]o be constitutionally compelled ... it is not enough that such [*voir dire*] questions might be helpful [in assessing whether a juror is impartial]. Rather, the trial court's failure to ask these questions must render the defendant's trial fundamentally unfair." *Mu'Min v. Virginia,* 500 U.S. 415, 425–26, 111 S.Ct. 1899, 114 L.Ed.2d 493 (1991). Since, unlike capital punishment, PFO sentencing is not something jurors are

## III. Errors By the Prosecutors Did Not Necessitate a Mistrial.

 Next, Jacobsen complains of two incidents when, he maintains, overreaching by the Commonwealth so tainted the proceedings as to necessitate a mistrial. A mistrial, of course, is an extreme remedy to be resorted to only when a fundamental defect in the proceedings has rendered a fair trial manifestly impossible. *Parker v. Commonwealth*, 291 S.W.3d 647 (Ky.2009). We review the trial court's decision to deny a mistrial under the abuse of discretion standard. *Id.* A prosecutor's misstep will necessitate a new trial only if it was flagrantly improper and so prejudicial as to render the trial unfair, *Barnes v. Commonwealth*, 91 S.W.3d 564 (Ky.2002); *Alexander v. Commonwealth*, 862 S.W.2d 856 (Ky.1993), *overruled on other grounds by Stringer v. Commonwealth*, 956 S.W.2d 883 (Ky.1997), or if it was objected to, was not cured by an adequate admonition, and cannot otherwise be deemed harmless. *Barnes*, 91 S.W.3d 564. The incidents of which Jacobsen complains did not rise to these standards and so did not necessitate a mistrial.

### A. A Prosecutor's Oblique Reference During *Voir Dire* to an Uncharged Offense Did Not Render Jacobsen's Trial Unfair.

Jacobsen complains first of a series of questions the Commonwealth asked during *voir dire*. Noting that investigators had not recovered the gun allegedly used during the robbery, the Commonwealth sought assurance that the jury would not, on that account, automatically rule out robbery in the first degree. To that end, one of the prosecutors put the matter to the prospective jurors as follows:

> The victim in this case will tell you that ... the defendant pointed a gun at her during the course of a robbery. The gun was never located. The law doesn't require the Commonwealth to bring you that gun. But if we prove to you beyond a reasonable doubt that this ... theft was committed with a gun, can everybody find the defendant guilty? Do we have to bring you the actual gun? Does everybody understand we don't have to bring you the gun? And why is that? I mean, who's responsible for a weapon after a crime is committed?

At that point, complaining that the Commonwealth was arguing its case, was attempting to diminish its burden of proof, and had implicitly accused him of an uncharged offense—tampering with physical evidence—Jacobsen objected and moved for a mistrial. The trial court immediately denied the motion for a mistrial, but agreeing with Jacobsen that the Commonwealth could not tell the jury what it was obliged to make of the gun evidence, or lack thereof, it sustained the objection and advised the Commonwealth to move on to a new topic. Apparently content with that relief, Jacobsen did not request an admonition, and the *voir dire* resumed without further reference to the gun. Jacobsen now contends, however, that the specter of the uncharged tampering offense so haunted the trial as to render it manifestly unfair. We disagree.

 While it is certainly true, as Jacobsen notes, that our evidence rules generally preclude mention of a defendant's uncharged bad acts with no relevance beyond their tendency to cast a bad light on the defendant's character, KRE

apt to be biased in favor of or against, and since Jacobsen has pointed to no suggestion of such bias in this case, we are not persuaded that the limitation *Lawson* places on penal-

ty-range *voir dire* questioning came anywhere near rendering Jacobsen's trial fundamentally unfair.

404(b), it is no less true that breaches of those rules are generally subject to admonitory cures and so, generally, do not provide grounds for a mistrial. *Bray v. Commonwealth*, 177 S.W.3d 741 (Ky.2005) (since admonition, had it been requested, would have cured improper reference to defendant's prior bad act, that reference did not necessitate a mistrial); *Johnson v. Commonwealth*, 105 S.W.3d 430 (Ky.2003) (admonition cured improper reference to defendant's guilty plea to an unrelated offense). We have recognized two sets of circumstances in which an admonition will not be presumed to have cured an improper reference to uncharged bad acts:

> (1) when there is an overwhelming probability that the jury will be unable to follow the court's admonition *and* there is a strong likelihood that the effect of the inadmissible evidence would be devastating to the defendant ... or (2) when the question was asked without a factual basis *and* was "inflammatory" or "highly prejudicial."

*Johnson*, 105 S.W.3d at 441 (citations omitted).

■ Neither exception applies here, because, even if improper, the Commonwealth's suggestion that Jacobsen may have disposed of the gun he used in the robbery was neither devastating, inflammatory, nor highly prejudicial, and because there is every reason to believe that the jury, had it been admonished to do so, could have disregarded the Commonwealth's suggestion. This result is in accord with the general rule noted above that, absent flagrant misconduct, an error by the prosecutor will warrant relief only if an admonition was requested and either denied or inadequately provided, and then only if the error was not otherwise harmless. Here, because the alleged error, if any, was not flagrant, and because an admonition could easily have cured it, the trial court did not abuse its discretion when it denied Jacobsen's motion for a mistrial.

## B. The Trial Court's Admonition Cured the Prosecutor's Improper Closing Argument.

■ The result is the same with respect to Jacobsen's other allegation of prosecutorial error. During closing argument, the Commonwealth's other prosecutor (there were two in this case), commenting on the testimony by Jacobsen's expert witness, Dr. Fulero, stated that,

> [t]he bottom line is the studies that Dr. Fulero has shown you are studies that talk about the unreliability of eyewitness testimony, but there's a whole other line of studies that talk about the reliability of eyewitness testimony.

Jacobsen immediately objected on the ground that there was no evidence of such another line of studies, and he again moved for a mistrial. The trial court agreed with him, correctly, that no evidence of other, contrary, studies could be inferred from Dr. Fulero's testimony, but rather than declare a mistrial it admonished the jury as follows:

> Ladies and gentlemen of the jury, let me clarify something for you because a comment was made by the prosecutor, about studies, about reliability of eyewitness identification. There was no testimony about studies other than what Dr. Fulero testified. So I'm going to strike from the record any reference about studies that were not introduced into evidence. So please ignore that last statement made by the prosecutor in this case; you're only to consider evidence that's presented at trial, all right?

Jacobsen objected to any remedy short of a mistrial on the ground that an admonition could not erase from the jurors' minds the idea, devastating to the defense, that

contrary expert evidence had been suppressed. He renews that objection here, referring us to *Johnson*, 105 S.W.3d 430. He argues that in the circumstances of this case the trial court's admonition cannot be relied upon to have cured the prosecutor's error because that error tended unfairly to undercut the defense's star witness and did so at a point in the trial when the defense could make no response. Again, we disagree.

Since the prosecutor usually argues last, an error during his or her argument will almost always occur when the defense has no opportunity to respond. Nevertheless, the rule in Kentucky has long been that an admonition to the jury to disregard an improper argument, like the admonitions discussed above to disregard evidentiary errors, "cures the error unless it appears the argument was so prejudicial, under the circumstances of the case, that an admonition could not cure it." *Price v. Commonwealth*, 59 S.W.3d 878, 881 (Ky.2001) (citing *Knuckles v. Commonwealth*, 261 S.W.2d 667 (Ky.1953), and *Thomas v. Commonwealth*, 196 Ky. 539, 245 S.W. 164 (1922)). Counsel, of course, although allowed wide latitude during closing arguments to comment on the evidence and to make reasonable inferences therefrom, "may not argue facts that are not in evidence or reasonably inferable from the evidence." *Garrett v. Commonwealth*, 48 S.W.3d 6, 16 (Ky.2001). Here Dr. Fulero testified to the effect that under laboratory conditions certain factors seem to enhance the accuracy of an eyewitness's recall. The prosecutor's purported extrapolation from that testimony to "a whole other line of studies" vindicating the accuracy of eyewitness testimony in general was neither a reasonable inference from nor a fair comment upon the evidence. The question is whether it was so unfair as to require a mistrial. Certainly a prosecutor's reference in closing to expert studies of which there was no evidence is troubling. Our review, however, is not for the purpose of punishing the prosecutor, but rather to assess the overall fairness of the trial. *Slaughter v. Commonwealth*, 744 S.W.2d 407 (Ky.1987). We are not persuaded that the trial court abused its discretion by deciding against a mistrial here and opting for an admonition instead. The prosecutor's error, although a serious one, was isolated and was not inflammatory. The admonition to disregard it came promptly and made clear that there was no basis for the prosecutor's reference to "other studies," and that the only studies were those referred to by Dr. Fulero. This admonition, we believe, adequately guarded against the jury's unfairly discounting Dr. Fulero's testimony, and we reject, therefore, Jacobsen's contention that the prosecutor's error was so egregious as to devastate the defense and to render an admonition futile. *Cf. Winstead v. Commonwealth*, 327 S.W.3d 386 (Ky.2010) (holding that admonitions adequately cured four instances during closing when the prosecutor misstated the evidence), *with Barnes*, 91 S.W.3d 564 (holding that new trial was required as a result of prosecutor's inflammatory argument to which twenty-nine objections were sustained and several others were not sustained, but should have been). The evidence against Jacobsen, moreover, while perhaps not overwhelming, was substantial. He was described, accurately and independently, by two witnesses, both of whom saw him at close range, in good light, for an appreciable amount of time. When shown the photo array just a couple of days after the robbery, both witnesses identified him without any hesitation. Their identifications were significantly corroborated

by Mr. Taminga's testimony to the effect that Jacobsen had displayed a particular fondness for flannel shirts, such as the one worn on a hot day by the robber, and by the fact that Jacobsen, like the robber, drove a white, Chevy S–10 pick-up truck. Notwithstanding the prosecutor's error, we are convinced that it was not fundamentally unfair to allow the duly admonished jury to decide this case.

## IV. The Trial Court Properly Limited Retrial to the Penalty Phase.

 The jury, as noted, found Jacobsen guilty of first-degree robbery. During the ensuing penalty proceeding, the Commonwealth (the same prosecutor who conducted *voir dire* ) committed a "golden rule" violation, which, upon Jacobsen's objection, prompted the trial court to declare a mistrial. A new sentencing jury was subsequently empanelled, and that jury, after finding Jacobsen to be a second-degree persistent felon, recommended that he be sentenced to an enhanced term of thirty years' imprisonment. It was that sentence that the trial court imposed. Jacobsen objected to being sentenced by a jury that had not heard his guilt phase evidence and moved for a complete, new trial, not merely a new penalty phase. His final contention on appeal is that the trial court erred by denying that new trial motion. He maintains that sentencing by what he describes as a "cold" jury deprived him unfairly of a chance for leniency arising from a guilt-phase jury's residual doubt. As the Commonwealth correctly notes, however, in *Williamson v. Commonwealth,* 767 S.W.2d 323 (Ky.1989), this Court affirmed prior holdings to the effect that "when the original jury is discharged for good cause in a PFO proceeding, it is proper to impanel a new jury to consider only the issue of punishment." 767 S.W.2d at 326. We have since reiterated that affirmation, implicitly at least, in cases ad-

dressing questions about the type and amount of evidence admissible at re-sentencing trials. *St. Clair v. Commonwealth,* 319 S.W.3d 300 (Ky.2010); *Boone v. Commonwealth,* 821 S.W.2d 813 (Ky. 1992). Jacobsen ignores this precedent, which not only defeats his claim of error, but answers his "cold jury" objection. A re-sentencing jury, simply, does not sentence in the vacuum Jacobsen suggests. As *St. Clair* and *Boone* indicate, on the contrary, in addition to the charges and the first jury's verdicts, the re-sentencing jury may be given, if requested and in a manner subject to the trial court's discretion, a meaningful idea of the evidence both sides presented during the guilt phase and the arguments they made. Such a proceeding, we believe, is, in general, fundamentally fair and adequately protects whatever right a defendant might have to appeal to the jury for leniency on any ground. *Cf. Oregon v. Guzek,* 546 U.S. 517, 126 S.Ct. 1226, 163 L.Ed.2d 1112 (2006) (holding that state re-sentencing procedure that allowed for introduction of transcripts of guilt phase evidence adequately protected any right capital defendant might have to argue "residual doubt" as a mitigating factor). The trial court did not err, therefore, by limiting Jacobsen's retrial to sentencing.

### CONCLUSION

In sum, Jacobsen was fairly tried and properly sentenced. The photo array that detectives showed to the two eye-witnesses did not highlight Jacobsen's photo in a suggestive way and so did not require that their identifications of him be suppressed. The trial court correctly limited *voir dire* concerning the penalty range to the penalties applicable to the indicted offense without PFO enhancement. Errors by the Commonwealth during *voir dire* and closing argument were appropriately ad-

dressed by the trial court and did not render the trial unfair. And finally, the penalty phase mistrial did not require a new trial of Jacobsen's guilt but only a new penalty phase. Accordingly, we affirm the Judgment of the Fayette Circuit Court.

All sitting. All concur.