RENDERED:  JUNE 7, 2024; 10:00 A.M.
TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2023-CA-0251-MR

JOHIEM MARQUELLE BANDY                        APPELLANT


v.                  APPEAL FROM KENTON CIRCUIT COURT
HONORABLE PATRICIA M. SUMME, JUDGE
ACTION NO. 22-CR-00777


COMMONWEALTH OF KENTUCKY                    APPELLEE


OPINION
AFFIRMING

** ** ** ** **

BEFORE:  CALDWELL, CETRULO, AND ECKERLE, JUDGES.

CETRULO, JUDGE:  Appellant Johiem Marquelle Bandy ("Bandy") appeals the Kenton Circuit Court's judgment and sentence on verdict of the jury, which found Bandy guilty of second-degree strangulation, fourth-degree assault, and fourth-degree criminal mischief.  Following the jury's recommendation, the trial court sentenced Bandy to five years of imprisonment and imposed two $500 fines.

# I. FACTUAL AND PROCEDURAL HISTORY

In July 2022, a grand jury indicted Bandy on counts of first-degree strangulation, fourth-degree assault, and second-degree criminal mischief. The indictment alleged that in April 2022, Bandy had strangled Amazeya Hankins ("Hankins"), struck her in the face, and took her cellphone and smashed it. The trial court held a two-day jury trial in November 2022. At trial, Bandy; Hankins; Felicia Blair, Hankins's mother ("Hankins's Mother"); Emily Neff, Hankins's neighbor ("Neighbor"); Selena McCormick, a forensic nurse and violence prevention coordinator who observed Hankins following the incident ("Nurse McCormick"); Raven Chioca ("Officer Chioca") and Joshua Knott ("Officer Knott"), two police officers who arrived at the scene of the incident; and Detective Greg Andrews ("Detective Andrews") testified.[1]

Hankins's Neighbor testified that on the day of the incident, she saw a "young man" in her neighbor's front yard holding her neighbor by the hair and punching her in the face. Prior to seeing the altercation, she heard a loud commotion coming from her neighbor's apartment and could hear a woman yell, "get off of me" and "why are you doing this?" She also heard a man yell, "I'll slap the shit out of you." Hankins's Neighbor then called the police and the "young

---

[1] Additionally, Bandy's friend, Myjon Hubbard, who was present for a portion of the incident, testified. However, Hubbard left Hankins's apartment before Bandy got physical with Hankins and did not contribute significant testimony relevant to the issues before this Court.

man" let go of Hankins and "took off." Although Hankins's Neighbor saw Bandy assaulting Hankins, she did not see Bandy with his hands around Hankins's neck or choking her.

Next, Hankins testified that she saw Bandy near her apartment on the day of the incident and initially invited him inside. At first, they were getting along well but eventually, Bandy started demanding money from Hankins. Hankins did not have any cash on her, so she had to go to the ATM. Hankins explained that she tried to get Bandy to leave her alone because she did not want to give him any money, but he was not deterred and followed her to the ATM. Once she got to the ATM, she stayed inside the store for a while, hoping Bandy would leave, but Bandy waited there for her. Bandy told her he was annoyed that it took her so long but when she exited the store to walk home, he walked in a different direction.

A few minutes later, Bandy and a friend showed up at Hankins's apartment and Bandy entered "with an attitude." At that time, Hankins was at the top of the stairs video chatting her mother.[2] Immediately, Hankins could tell Bandy was mad, and at one point, he told his friend to leave because he was going to beat up Hankins. She was then in the upstairs bathroom when Bandy ran up the

---

[2] Hankins testified that she had been on the phone with her mother for most of the morning because she knew how Bandy could be and that he would get upset if she did not give him what he wanted.

stairs and grabbed her by the neck with both hands. Hankins testified that she could not breathe and could barely talk, but she told him to let her go. He did not let her go. Eventually, he let go with one hand to grab Hankins's phone and once he got the phone, he let go of her. Hankins testified that once Bandy let her go, she was dizzy, lightheaded, sick to her stomach, and struggling to catch her breath. Then she exited the bathroom and Bandy started hitting her with both hands as they made their way down the stairs and out to the front yard. Outside, Bandy kept hitting Hankins and Hankins's Neighbor called the police. At that point, Bandy left.

Once the police arrived, Hankins was interviewed and sent to the hospital for treatment. At the hospital, she was treated for pain in her head, face, and throat. Hankins testified that she arrived with bruises, knots, and swelling on her face; and before the incident, she did not have any of those injuries or pain. Further, Hankins's voice was different following the assault, due to the pain imposed and crying during the incident. Hankins identified the defendant, Bandy, as the aggressor.

On cross-examination, the defense asked Hankins if she told the police she was *not* going to pass out during or following the choking, but she did not recall saying that. Defense counsel played the video of the interview to Hankins to refresh her recollection. After listening to the video, Hankins

confirmed that she had previously said "it wasn't to the point where she was going to pass out" but she emphasized that she still could not breathe when Bandy had his hands around her neck.

Next, Hankins's Mother testified that on the day of the incident, she and Hankins were video chatting while Bandy was at Hankins's apartment. She testified that she heard yelling and Hankins told her Bandy was mad. Hankins's Mother also heard Bandy tell his friend to leave because he was going to beat up Hankins. Then, Hankins went to the bathroom and Hankins's Mother heard Bandy run up the stairs. Then, she heard Hankins yell, "Ma, he's choking me." After that, the phone screen went black, and Hankins's Mother drove to Hankins's apartment. She testified that when she arrived, Hankins was crying and told her, "He was choking me, I thought I was about to die." Further, Hankins told her mother her throat hurt, and that Bandy had "taken [her] breath." Hankins's Mother noticed that her daughter had swelling on her face, her voice was raspy, and some of her braids had been pulled from her hair.

Next, Officer Chioca testified that when she arrived at the scene of the incident, Hankins was distraught. Hankins was crying and shaking and was having a difficult time catching her breath to talk to Officer Chioca. Officer Chioca "knew that something bad had happened to her [Hankins]." Additionally, the Commonwealth submitted Officer Chioca's body camera footage showing Hankins

crying and struggling to catch her breath. In the video, when Hankins identified the aggressor as Bandy, Officer Chioca mentioned on her radio that he had "a bunch of priors." Defense counsel objected to the admission of prior bad acts and the Commonwealth acknowledged that those phrases were supposed to have been edited out of the video. The defense requested a mistrial; however, the trial court did not believe that it was a "manifest necessity." The trial court offered to instead admonish the jury regarding that statement; however, defense counsel insisted that he was not requesting an admonition and would "not settle for anything short of a mistrial." The trial court denied the motion for mistrial.

Officer Knott then testified and largely confirmed Officer Chioca's series of events. Officer Knott transported Hankins to the hospital and attended portions of her medical treatment. During Hankins's discussions with the nursing staff,[3] Hankins stated that she was choked, hit in the face and head, and felt as though she was going to pass out.

Next, Nurse McCormick testified that she completed a medical forensic exam on Hankins at the emergency department. Hankins had reported to Nurse McCormick that she had been strangled. After Hankins detailed the strangulation, Nurse McCormick completed a "head to toe" exam. During the exam, Nurse McCormick noted that Hankins had abrasions on her face and head,

---

[3] These conversations were captured on Officer Knott's body camera.

and subconjunctival hemorrhages and redness in her eye. Nurse McCormick explained that subconjunctival hemorrhages were consistent with a report of strangulation because such injuries result from the obstruction of blood flow to the brain through the neck. Defense counsel inquired whether the subconjunctival hemorrhages could have resulted from other injuries like forceful sneezing, coughing, or vomiting. Nurse McCormick agreed that the hemorrhages could be consistent with such actions and that Hankins had informed her that she had vomited earlier in the day and had been crying throughout the day.

Then, Detective Andrews testified. He spoke with Hankins in the days following the incident and spoke with Bandy once he had been picked up "on separate charges." During those discussions, Bandy told Detective Andrews that he had assaulted Hankins.[4] In the interview, Bandy explained to Detective Andrews that his anger had been "building up and building up" and that he punched Hankins multiple times once they got to the front yard and then threw Hankins's phone on the ground. Detective Andrews noted that although Bandy denied the strangulation, he admitted to the remaining charges in the interview video.

The Commonwealth rested, and Bandy moved for a directed verdict on the strangulation charge, claiming the Commonwealth failed to present

---

[4] Detective Andrews's recollection of the admission was confirmed via video of that interview.

sufficient proof that Bandy impeded Hankins's air or blood circulation. The Commonwealth contended that it had presented sufficient evidence of that charge. The trial court overruled the motion and noted that Nurse McCormick specifically testified that Hankins's injuries were consistent with strangulation and that Hankins had testified that she believed she was going to pass out during and after the incident. Further, the police officers' body camera videos showed Hankins's severe distress.

Finally, Bandy testified. He largely confirmed Hankins's recollection of the incident. Bandy admitted that he and Hankins got into a physical altercation; he hit Hankins; they fought back and forth; and, he took Hankins's phone outside and smashed it. However, he denied strangling Hankins.

Following the defense case, Bandy renewed his motion for a directed verdict; however, again, the trial court denied it, finding the Commonwealth presented sufficient evidence to bring the action. Further, the trial court found the issue of Bandy's credibility in denying the strangulation was a question of fact for the jury.

After a little over an hour of deliberation, the jury delivered a guilty verdict on all three charges. Before the sentencing phase, the Commonwealth informed the trial court that it intended to introduce a prior conviction for assault and robbery that had subsequently been pardoned by former Governor Matt Bevin.

The defense objected, and the trial court heard arguments, but allowed the prior conviction testimony to be admitted. The conviction was introduced through Andrew Munson, a probation and parole officer. Officer Munson was then subject to cross-examination by the defense and asked to read the certified copy of the pardon to the jury. In his closing argument, the defense stated:

> As you have all heard, at the time of the prior offenses you have heard about in this case, he was 14-years old. And not only that, he was ultimately pardoned by the governor. So we ask that you not hold that against him and simply pass judgment on him on the facts of this case.

In the Commonwealth's closing statement during this phase, it stated that Governor Bevin had granted Bandy's pardon "in the cloak of darkness" with "one foot out the door." Defense counsel did not object. The jury recommended a sentence of five years of imprisonment for the second-degree strangulation; 12 months of imprisonment and a $500 fine for the fourth-degree assault; and 12 months of imprisonment and a $500 fine for fourth-degree criminal mischief. Defense counsel did not object to the imposition of the $500 fines. Additional facts will be discussed, as needed.

## II. ANALYSIS

Bandy argues the trial court erred when it (A) admitted testimony regarding Bandy's previous untruthfulness to police; (B) allowed the Commonwealth to introduce a pardoned conviction during the penalty phase; (C)

-9-

failed to grant a mistrial after the jury heard unedited body camera video, which stated Bandy had a "warrant for the same stuff" and "a bunch of priors"; (D) failed to grant a directed verdict on the strangulation charge; and (E) imposed two $500 fines, in violation of Kentucky Revised Statute ("KRS") 534.040(4).

### A.     Questions Regarding Untruthfulness

First, Bandy argues that the trial court erred when it permitted the Commonwealth to question Bandy regarding conflicting statements he had given to police regarding a separate strangulation charge. Bandy contends that such questioning violated Kentucky Rule of Evidence ("KRE") 608, which governs the use of specific instances of conduct for the purposes of attacking a witness's credibility. Bandy argues that under KRE 608, "counsel is limited to asking the witness about the specific instance of conduct on cross-examination and is stuck with whatever answer is given[,]" citing *Allen v. Commonwealth*, 395 S.W.3d 451, 462 (Ky. 2013).

While Bandy acknowledges that KRE 608 and *Allen* allow the Commonwealth to inquire about his untruthfulness with the police, he asserts that the questioning went too far and violated KRE 404(b), which prohibits the introduction of prior bad acts to show a criminal predisposition. As such, Bandy argues the Commonwealth's questions should have been limited to "have you ever lied to police?" and should not have referenced a specific instance. However, the

Commonwealth asserts that the questions regarding Bandy's prior untruthfulness were proper under KRE 608.

We review the trial court's decisions regarding evidentiary issues for abuse of discretion. *Clark v. Commonwealth*, 223 S.W.3d 90, 95 (Ky. 2007) (citation omitted). The test for abuse of discretion is whether the trial court's decision "was arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *Id*. (internal quotation marks and citation omitted).

KRE 608(b) provides that

> [s]pecific instances of the conduct of a witness, for the purpose of attacking or supporting the witness' credibility, other than conviction of crime as provided in Rule 609, may not be proved by extrinsic evidence. *They may, however, in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness*: (1) concerning the witness' character for truthfulness or untruthfulness . . . . No specific instance of conduct of a witness may be the subject of inquiry under this provision unless the cross-examiner has a factual basis for the subject matter of his inquiry.

(Emphasis added.)

Here, before beginning its cross-examination of Bandy, the Commonwealth approached the bench and discussed its intention to present evidence that Bandy had lied to police about previously strangling someone. The defense argued that such questioning would violate KRE 404(b), but the Commonwealth contended that it spoke to Bandy's credibility and did not fall

-11-

under KRE 404(b). Further, the Commonwealth argued that it was not required to provide notice of such questioning when it raised credibility concerns on cross-examination. The trial court agreed that the line of questioning went toward credibility and therefore did not fall under KRE 404(b).

The Commonwealth indicated that it planned to ask Bandy whether he had ever lied to Detective Andrews about previously choking someone. If Bandy said no, the Commonwealth planned to say that Bandy had told an officer that he did choke a different woman and then changed his narrative and told Detective Andrews that he did not choke that person. The judge clarified that although the Commonwealth was potentially presenting another act, it was being used to show credibility; therefore, it was permissible. Defense counsel argued that it was unduly prejudicial to bring forward information from a similar but separate case and essentially would be creating a trial within a trial.

Defense counsel emphasized that the Commonwealth needed to make the questioning clear that the lying did not involve the present case. The trial court specified that the question was whether, when talking to officers about a similar action, he told two different stories to two different officers. Whether Bandy committed the other act was not the question before the trial court. Defense counsel posited that the Commonwealth could ask, "in a different situation, did you tell the police that you choked someone and then later tell them that you

didn't?" Defense counsel conceded that what the trial court had stated "makes sense" and that such questioning was fine.

When the jury returned, the Commonwealth asked Bandy whether he had ever told police that he choked someone and Bandy answered "yes." Then, the Commonwealth asked if Bandy then told Detective Andrews that he had not choked someone and again Bandy answered, "yes." The Commonwealth stated that if he told two officers two different stories, he had to have lied to one of those officers and Bandy said, "yes." Defense counsel did not object to that line of questioning.

In *Allen*, our Supreme Court explained that

> KRE 608 lays out a substantive limit: the conduct must be probative of truthfulness or untruthfulness. As long as the conduct in question is so probative, whether it resulted in a criminal conviction or not, the court may, in its discretion, allow inquiry into it but not extrinsic proof of the conviction itself. KRE 608 also lays out two procedural safeguards: the conduct cannot be proved with extrinsic evidence, and may only be inquired into on cross-examination.

*Allen*, 395 S.W.3d at 466.

Similarly, here, the Commonwealth simply cross-examined Bandy regarding his prior instance of untruthfulness with the police. He admitted the

same, and the examination ended there.[5]  Our caselaw and rules permit questioning

a defendant's truthfulness in the way the Commonwealth did here.[6]  As such, the

trial court did not abuse its discretion when it permitted such cross-examination.

### B.  Introduction of Pardoned Conviction During Penalty Phase

Next, Bandy claims that the trial court improperly permitted the

Commonwealth to introduce a certified copy of Bandy's prior conviction, which

had been pardoned.[7]  Bandy argues a pardoned conviction should not be used

during sentencing, citing *Fletcher v. Graham*, 192 S.W.3d 350, 362 (Ky. 2006)

(quoting *Nelson v. Commonwealth*, 109 S.W. 337, 338 (Ky. 1908)), which stated,

"The pardoned man is relieved from all the consequences which the law has

annexed to the commission of the public offense of which he has been pardoned,

and attains new credit and capacity, as if he had never committed that public

offense."

---

[5] If Bandy had stated that he had not lied to police, the Commonwealth planned to submit video interviews of his conflicting statements.  As that issue is moot, we need not address whether admission of those videos would have been proper.

[6] Bandy urges this Court to consider *Smoot v. Commonwealth*, No. 2015-CA-001893-MR, 2018 WL 3595827 (Ky. App. Jul. 27, 2018); however, our Supreme Court ordered that opinion not to be published and it is therefore not binding on our analysis.  *See* Kentucky Rule of Appellate Procedure 41(A).

[7] Additionally, Bandy argues the Commonwealth improperly commented on the pardon, stating Governor Bevin granted it "in the cloak of darkness" with "one foot out the door"; however, defense counsel did not object to such statements and the trial court did not have the opportunity to rule on the appropriateness of such statements.  As such, the issue is not properly before this Court.

However, *Fletcher* also notes that collateral consequences may still flow from a pardoned conviction, including impeachment as a felon. *Id.* Further, the Commonwealth contends that the prior conviction was admissible under KRS 532.055(2)(a), the Truth In Sentencing Act. The Truth In Sentencing Act provides, in relevant part, that

> [e]vidence may be offered by the Commonwealth relevant to sentencing including: 1. Minimum parole eligibility, prior convictions of the defendant, both felony and misdemeanor; 2. The nature of prior offenses for which he was convicted; 3. The date of the commission, date of sentencing, and date of release from confinement or supervision from all prior offenses[.]

This Court has emphasized that "while a full pardon has the effect of removing all legal punishment for the offense and restoring one's civil rights, it does not wipe out either guilt *or the fact of the conviction.*" *Harscher v. Commonwealth*, 327 S.W.3d 519, 522 (Ky. App. 2010) (citation omitted) (emphasis added). *See also Fletcher*, 192 S.W.3d at 363 (Ky. 2006) ("Thus, while a pardon will foreclose punishment of the offense itself, it does not erase the fact that the offense occurred, and *that fact may later be used to the pardonee's detriment.*") (emphasis added).

As discussed above, evidentiary issues are reviewed for abuse of discretion. *See Clark*, 223 S.W.3d at 95 (citation omitted). Here, the trial court determined that there was no Kentucky precedent precluding a jury from

-15-

considering a defendant's pardoned conviction. Instead, as noted above, Kentucky precedent has acknowledged that pardoned convictions could "later be used to the pardonee's detriment." *See Fletcher*, 192 S.W.3d at 363. Further, because a pardon does not "wipe out . . . the fact of the conviction" – *Harscher*, 327 S.W.3d at 522 (citation omitted) – such a conviction remains valid and may be admissible under KRS 532.055(2)(a), which states the Commonwealth may introduce evidence of the defendant's prior convictions. As such, the trial court's decision to allow evidence of Bandy's pardoned conviction was reasonable and supported by sound legal principles; therefore, the trial court did not abuse its discretion.

### C. Unedited body camera video

Bandy argues the trial court erred when it denied his motion for mistrial following the admission of unedited body camera footage. During Officer Chioca's testimony, the Commonwealth submitted her body camera video, which showed that Bandy had "priors" and a similar prior conviction. When Bandy heard those statements and objected, the Commonwealth acknowledged the error and explained that "Commonwealth staff" was supposed to remove those statements from the video.[8] The trial court agreed that they should have been omitted, but did not believe that it warranted a mistrial. Instead, the trial court offered to admonish

---

[8] We emphasize that this is not a sufficient excuse. An attorney has the duty to diligently review the work of subordinates to ensure such oversight does not occur at trial.

-16-

the jury regarding that statement; however, defense counsel insisted that it was not requesting an admonition and would "not settle for anything short of a mistrial."

A trial court has broad discretion to determine whether to grant a mistrial or to admonish the jury. *St. Clair v. Commonwealth*, 455 S.W.3d 869, 892 (Ky. 2015) (citing *Matthews v. Commonwealth*, 163 S.W.3d 11, 17 (Ky. 2005)). As such, we review such decisions for abuse of discretion. *Id.*

> Our Supreme Court has explained the standard for mistrials:
>
> "[A] mistrial is an extreme remedy and should be resorted to only when there is a fundamental defect in the proceedings and there is a 'manifest necessity for such an action.'" *Woodard v. Commonwealth*, 147 S.W.3d 63, 68 (Ky. 2004) (citing *Bray v. Commonwealth*, 68 S.W.3d 375, 383 (Ky. 2002)). "The occurrence complained of must be of such character and magnitude that a litigant will be denied a fair and impartial trial and the prejudicial effect can be removed in no other way." *Woodard*, 147 S.W.3d at 68 (quoting *Gould v. Charlton Co., Inc.*, 929 S.W.2d 734, 738 (Ky. 1996)). A trial court's decision to grant a mistrial must be supported by a "manifest necessity" for that decision in the record. *Wiley* [*v. Commonwealth*, 575 S.W.2d 168, 168 (Ky. App. 1978)] (citations omitted). This necessity must be "an urgent and real necessity." *Id.* (quoting *Baker v. Commonwealth*, [132 S.W.2d 766 (Ky. 1939)]).

*Commonwealth v. Padgett*, 563 S.W.3d 639, 646 (Ky. 2018).

When conducting this analysis, the trial court should consider if an admonition could cure the complained-of error. *Jacobsen v. Commonwealth*, 376 S.W.3d 600, 611 (Ky. 2012). Here, the Commonwealth argues the error did not

rise to a manifest necessity because it was fleeting, inadvertent, and the jury would likely have heeded an admonition, citing *Johnson v. Commonwealth*, 105 S.W.3d 430, 441 (Ky. 2003). We agree. As the Commonwealth noted, in *Jacobsen*, 376 S.W.3d at 610, our Supreme Court found that,

> absent flagrant misconduct, an error by the prosecutor will warrant relief only if an admonition was requested and either denied or inadequately provided, and then only if the error was not otherwise harmless. Here, because the alleged error, if any, was not flagrant, and because an admonition could easily have cured it, the trial court did not abuse its discretion when it denied [defendant's] motion for a mistrial.

Further, as the Commonwealth noted, our Supreme Court recently indicated that violations of

> KRE 404(b)'s rule against the admission of prior bad acts as character evidence are generally subject to admonitory cures. Such an admonition to the jury is deemed to cure an error unless "the argument was so prejudicial, under the circumstances of the case, that an admonition could not cure it."

*Lewis v. Commonwealth*, 642 S.W.3d 640, 643 (Ky. 2022) (citations omitted).

We find the trial court's decision to offer an admonition to the jury – instead of a mistrial – in light of the Commonwealth's inadvertent but inappropriate presentation of prior bad acts was not an abuse of discretion.

-18-

**D.    Directed Verdict on Strangulation Charge**

This Court reviews the denial of a motion for directed verdict under an "any rational juror" standard; *i.e.*, we must determine whether any rational juror could have found all the elements of the crime, "viewing the evidence in [a] light most favorable to the Commonwealth[.]" *Quisenberry v. Commonwealth*, 336 S.W.3d 19, 35 (Ky. 2011) (citing *Commonwealth v. Benham*, 816 S.W.2d 186, 187 (Ky. 1991) ("On appellate review, the test of a directed verdict is, if under the evidence as a whole, it would be clearly unreasonable for a jury to find guilt[.]")). "For the purpose of ruling on the motion, the trial court must assume that the evidence for the Commonwealth is true, but reserving to the jury questions as to the credibility and weight to be given to such testimony." *Benham*, 816 S.W.2d at 187.

KRS 508.175, the statute detailing second-degree strangulation, provides

> (1) A person is guilty of strangulation in the second degree when the person, without consent, wantonly impedes the normal breathing or circulation of the blood of another person by:
>
> > (a) Applying pressure on the throat or neck of the other person; or
> >
> > (b) Blocking the nose or mouth of the other person.
>
> (2) Strangulation in the second degree is a Class D felony.

Bandy argues that the testimony at trial did not establish that he impeded Hankins's breathing or blood circulation. Bandy concedes the testimony that Hankins was not able to breathe, but argues she also testified that she was able to speak, and "speaking requires breathing." Further, Bandy contends that Hankins did not feel as though she was going to pass out; therefore, there was not adequate evidence of strangulation. We disagree. KRS 508.175 requires neither that the victim lose consciousness nor that she feel as though she may. The Kentucky Supreme Court reached the same conclusion in *Saxton v. Commonwealth*, 671 S.W.3d 1, 10-11 (Ky. 2022), in which it held that

> "Impede" is defined as "to interfere with the progress of." *Webster's New Dictionary of the English Language* 259 (2001). It is more traditionally defined as "to hinder" or "to obstruct." Samuel Johnson, *A Dictionary of the English Language* 374 (Barnes & Noble Books 1994) (1756). [Victim's] testimony that she could not breathe and that she felt she would pass out as a result of [defendant] squeezing her neck with his hand and forearm easily satisfies the elements required by law thus, we find no error in the trial court's refusal to grant a directed verdict as a matter of law. Moreover, the trial court was required to take [the Commonwealth's] account as true. Therefore, under the evidence as a whole, it was not clearly unreasonable for the jury to find guilt.

As outlined previously, multiple witnesses presented evidence that indicated Bandy strangled Hankins. Nurse McCormick further detailed her extensive physical examination of Hankins at the hospital and concluded that Hankins's injuries were consistent with strangulation. Although Bandy contended

-20-

that Hankins's injuries could have been the result of things other than strangulation, it was the jury's duty to consider both parties' explanation of events and weigh the evidence. *Lamb v. Commonwealth*, 510 S.W.3d 316, 325 (Ky. 2017) (citing *Benham*, 816 S.W.2d at 187) ("Questions about the credibility and weight to be given to the evidence are reserved to the jury."). Based on the ample testimony, videos, and images presented, a reasonable juror could find that Bandy strangled Hankins. Therefore, the trial court did not err when it denied Bandy's motion for directed verdict.

### E. Imposition of Fines

Next, Bandy claims that the trial court erred when it imposed two $500 fines at sentencing, violating KRS 534.040(4).[9] Although Bandy acknowledges that he did not properly preserve the issue, he claims "the Court may review sentencing errors even when not properly preserved in the trial court because sentencing is jurisdictional." *Travis v. Commonwealth*, 327 S.W.3d 456, 459 (Ky. 2010). He requests this Court review for palpable error. However, our Supreme Court has held that "[i]f a trial judge was not asked at sentencing to determine the defendant's poverty status and did not otherwise presume the defendant to be an indigent or poor person before imposing court costs, then there

---

[9] KRS 534.040(4) provides that "[f]ines required by this section shall not be imposed upon any person determined by the court to be indigent pursuant to KRS Chapter 31."

is no error to correct on appeal." *Trigg v. Commonwealth*, 460 S.W.3d 322, 333

(Ky. 2015) (quoting *Spicer v. Commonwealth*, 442 S.W.3d 26, 35 (Ky. 2014)).

Likewise, the same rule applies to fees and fines:

> The same analysis is applicable to the imposition of fines upon persons determined to be indigent, or "needy" under KRS 31.120 (listing factors to be considered in determining whether a person is "needy"). Unless the imposition of a fine upon an indigent or "needy" person is apparent on the face of the judgment or is in obvious conflict with facts established in the record (*such as plainly having been found indigent at all stages of the trial proceedings*), we do not regard it as a sentencing error that is reviewable on appeal in the absence of preservation.

*Id.* (emphasis added).

Here, Bandy did not challenge the imposition of the fines at

sentencing; therefore, we must determine whether Bandy's indigency status was

obvious on the face of the judgment or in conflict with the record. *See Trigg*, 460

S.W.3d at 333 ("The indigent defendant is obligated to challenge the imposition of

a fine that is contrary to KRS 534.040(4), and failure to do so will foreclose

appellate review unless the error is apparent on the face of the judgment, or his

indigency at the time of sentencing is otherwise plainly established in the record.").

Findings of indigency or representation by the Department of Public

Advocacy throughout the proceedings are facts that may indicate a defendant is

indigent. *See Hall v. Commonwealth*, 551 S.W.3d 7 (Ky. 2018); *see also Trigg*,

460 S.W.3d at 333. In *Hall*, the Kentucky Supreme Court found that "[b]ecause

appointed counsel represented Hall throughout the proceedings, we may assume . . . that the trial court improperly imposed a fine in violation of KRS 534.040(4)." *Hall*, 551 S.W.3d at 21. As such, the Court reversed the judgment insofar as it imposed the fine. *Id.*

Here, however, Bandy was not represented by appointed counsel throughout the proceedings. While the record indicates that the trial court initially appointed a public defender when Bandy first appeared and Bandy submitted a financial statement, affidavit of indigence, and request for appointment of legal counsel, the record does not indicate whether the trial court ever granted Bandy's request for appointed counsel or found Bandy to be indigent. Further, the record indicates that Bandy retained private counsel for the trial and did not submit a motion to appoint the Department of Public Advocacy, citing indigency, until post-conviction and sentencing. Only at that point, weeks after sentencing, did the trial court find Bandy to be indigent and allow Bandy to proceed *in forma pauperis* for the appeal. As such, the record at sentencing did not clearly establish that the trial court had found him to be indigent and would not have assumed he was indigent, as he had private counsel.

Because defense counsel failed to challenge the imposition of fines at sentencing and Bandy's poverty status was not apparent on the face of the record at

sentencing, the trial court's imposition of fines is not reviewable on appeal. *See Trigg*, 460 S.W.3d at 333.

### F. Cumulative Error

Finally, Bandy argues that the alleged errors resulted in cumulative error and rendered the trial fundamentally unfair; therefore, the resulting judgment should be reversed. Cumulative error is "the doctrine under which multiple errors, although harmless individually, may be deemed reversible if their cumulative effect is to render the trial fundamentally unfair." *Brown v. Commonwealth*, 313 S.W.3d 577, 631 (Ky. 2010). Our Supreme Court has found cumulative error "only where the individual errors were themselves substantial, bordering, at least, on the prejudicial." *Id.* (citing *Funk v. Commonwealth*, 842 S.W.2d 476 (Ky. 1992)). However, as indicated, none of the alleged errors individually raised any real question of prejudice to Bandy. As our Supreme Court noted in *Brown*, "[a]lthough errors crept into this trial, as they inevitably do in a trial . . . they did not, either individually or cumulatively, render the trial unfair." *Id.* Likewise, here we find no cumulative error.

### III. CONCLUSION

For the foregoing reasons, we AFFIRM the Kenton Circuit Court judgment.

ALL CONCUR.

-24-

BRIEFS FOR APPELLANT:

Aaron Reed Baker
Frankfort, Kentucky

BRIEF FOR APPELLEE:

Russell Coleman
Attorney General of Kentucky

Thomas A. Van de Rostyne
Assistant Attorney General
Frankfort, Kentucky